**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| NORTHWELL HEALTH, INC., | :    Civil Action No. 20 Civ. 06893 (LTS) |
| Plaintiff, | : |
| v. | :    ORAL ARGUMENT REQUESTED |
| ILLINOIS UNION INSURANCE COMPANY, | : |
| Defendant. | : |

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF**
**NORTHWELL HEALTH, INC.'S MOTION FOR PARTIAL SUMMARY JUDGMENT**

MCKOOL SMITH, P.C.
One Manhattan West
395 9th Avenue, 50th Floor
New York, New York 10001
Tel: (212) 402-9400
Fax: (212) 402-9444

*Attorneys for Plaintiff Northwell Health, Inc.*

## TABLE OF CONTENTS

**Page(s)**

PRELIMINARY STATEMENT ....................................................................................................1

STATEMENT OF MATERIAL FACTS....................................................................................4

      A.    The Parties and Their Contractual Relationship ...........................................4

      B.    Northwell's Claim and Chubb's Denial of Coverage .................................6

ARGUMENT .................................................................................................................................9

    I.    LEGAL STANDARDS.................................................................................9

    II.    AS A MATTER OF LAW, NORTHWELL HAS SUFFERED A "FACILITY-BORNE ILLNESS EVENT"................................................................................12

      A.    SARS-CoV-2, the Virus that Causes COVID-19, is "Facility-Borne"......12

      B.    Chubb's Additional Requirements for Coverage for "Facility-Borne Illnesses" Fail As A Matter of Law ........................................................14

CONCLUSION..............................................................................................................................17

i

## TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*AGCS Marine Ins. Co. v. World Fuel Servs., Inc.*,
  220 F. Supp. 3d 431, 436 (S.D.N.Y. 2016)........................................................10, 11

*Belt Painting Corp. v. TIG Ins. Co.*,
  100 N.Y.2d 377 (2003)...................................................................................10, 11

*Brown Bros. Elec. Contrs. v. Beam Constr. Corp.*,
  41 N.Y.2d 397 (1977).............................................................................................10

*Celotex Corp. v. Catrett*,
  477 U.S. 317 (1986)...................................................................................................9

*Century Sur. Co. v. All In One Roofing, LLC*,
  63 N.Y.S.3d 406 (2d Dep't 2017)..........................................................................11

*Christa McAuliffe Intermediate Sch. PTO, Inc. v. De Blasio*,
  364 F. Supp. 3d 253 (S.D.N.Y. 2019)....................................................................13

*City of New York v. Phil. Indem. Ins. Co.*,
  864 N.Y.S.2d 454 (2d Dep't 2008).........................................................................15

*Cole v. Macklowe*,
  953 N.Y.S.2d 21 (1st Dep't 2012) .........................................................................11

*Cont'l Cas. Co. v. Rapid-Am. Corp.*,
  80 N.Y.2d 640 (1993)..............................................................................................11

*CT Inv. Mgmt. Co., LLC v. Chartis Specialty Ins. Co.*,
  9 N.Y.S.3d 220 (1st Dep't 2015) ...........................................................................10

*In re Estates of Covert*,
  97 N.Y.2d 68 (2001) ...............................................................................................10

*In re Viking Pump, Inc.*,
  27 N.Y.3d 244 (2016)..............................................................................................11

*Lend Lease (US) Constr. LMB Inc. v. Zurich Am. Ins. Co.*,
  28 N.Y.3d 675 (2017)..............................................................................................16

*Mason Tenders Dist. Council Welfare Fund v. Kafka Constr., Inc.*,
  No. 16 Civ. 9911 (KPF), 2018 WL 2138621 (S.D.N.Y. May 9, 2018)....................9

*Nat'l Football League v. Vigilant Ins. Co.*,
    824 N.Y.S.2d 72 (1st Dep't 2006) ...................................................................11

*Seaboard Sur. Co. v. Gillette Co.*,
    64 N.Y.2d 304 (1984) ...................................................................................11

*Selective Ins. Co. of Am. v. County of Rensselaer*,
    26 N.Y.3d 649 (2016) ...................................................................................10

*Thomas J. Lipton, Inc. v. Liberty Mut. Ins. Co.*,
    34 N.Y.2d 356 (1974) ..............................................................................11, 16

*Wells Fargo Bank, N.A. v. Wrights Mill Holdings, LLC*,
    127 F. Supp. 3d 156, 167 (S.D.N.Y. 2015) ..................................................13

*White v. Cont'l Cas. Co.*,
    9 N.Y.3d 264 (2007) .....................................................................................10

**OTHER AUTHORITIES**

Merriam Webster Dictionary ........................................................................12, 13

NYS Department of Health's "COVID-19 Frequently Asked Questions"
    https://coronavirus.health.ny.gov/system/files/documents/2020/04/doh_covid1
    9_faqs_updated_041720_2.pdf (last accessed on September 18, 2020)....................................8

World Health Organization's "Q&A:  How is COVID-19 transmitted?"
    https://www.who.int/emergencies/diseases/novel-coronavirus-2019/question-
    and-answers-hub/q-a-detail/q-a-how-is-covid-19-transmitted (last accessed on
    September 18, 2020) .......................................................................................8

Plaintiff Northwell Health, Inc. ("Northwell" or "Plaintiff"), submits this memorandum of law in support of its motion pursuant to Federal Rule of Civil Procedure 56 for partial summary judgment in its favor and against Illinois Union Insurance Company ("Chubb" or "Defendant").[1]

## PRELIMINARY STATEMENT

This action arises out of Chubb's failure to provide insurance coverage for Northwell's significant costs and losses incurred responding to the ongoing coronavirus pandemic. Northwell is the largest health care provider and private employer in New York State, and it operates multiple health care facilities, including several hospitals, throughout the New York metro area. When the pandemic arrived in New York, Northwell and its employees rose to the occasion, risking their lives on the front lines in the fight against COVID-19, and working tirelessly to provide critical medical care to those affected by the pandemic. In responding to a health care crisis, the likes of which the world has not seen in over a century, Northwell has suffered and continues to suffer enormous costs and losses, including, among other things, significant increases in the cost to maintain and decontaminate its facilities to ensure the safety of its employees and patients.

In exchange for substantial premiums, Chubb sold Northwell a $20 million "Healthcare Premises Pollution Liability Insurance Policy" (the "Policy"), which straightforwardly provides coverage for "facility-borne illness events" and broadly defined "pollution conditions." When the pandemic hit, Northwell turned to Chubb to live up to its obligations under the Policy and

---

[1] Illinois Union Insurance Company generally is referred to herein as "Chubb" because it is part of the Chubb Group of Insurance Companies and has referred to itself as "Chubb" in its correspondence related to this claim.

provide the coverage Northwell had purchased for precisely this situation. Chubb denied coverage in its entirety, forcing Northwell to bring this action.

Now, Northwell moves for partial summary judgment on the threshold issue that COVID-19, and the virus that causes it, plainly satisfy the Policy definition of a "facility-borne illness event," triggering coverage.[2]  Resolution of this issue can be achieved as a matter of law by operation of the express Policy language and the undisputed facts.

The Policy provides coverage for a "facility-borne illness event," which is defined as "the presence of a facility-borne infectious *virus*, bacteria or disease at a 'covered location.'"  The Policy identifies only one exception to this definition of otherwise covered facility-borne illnesses.  It bars coverage only if a facility-borne illness is *both* "(1) naturally occurring in the environment in amounts and concentrations discovered at the 'covered location'; and (2) *solely* or *exclusively* the result of communicability through human-to-human contact."  Policy at p. 12 of 62 (emphasis added).[3]  Chubb concedes that the meaning of "facility-borne illness," based on the dictionary definitions of "facility" and "borne," is commonly understood as those illnesses that are "transported or transmitted by" the facility.

Further, consistent with numerous public health organizations and agencies, including the World Health Organization ("WHO") and the New York State Department of Health, Chubb also acknowledges that the virus is not exclusively transmitted by human-to-human contact.  Rather, the virus can live on surfaces and objects (such as Northwell's facilities) and therefore can transmit to humans from those surfaces.  In doing so, Chubb necessarily admits that the

---

[2] Northwell is also making a claim to Chubb under the Policy's coverages applicable to "pollution conditions" that have arisen in response to the coronavirus pandemic.  However, Northwell is not making a motion before the Court at this time based on the specific Policy provisions addressing "pollution conditions."

[3] As the Policy is not consecutively paginated, citations to the Policy are to the page numbers of the PDF attached as Exhibit 1 to the Declaration of Robin L. Cohen.

exception does not apply and therefore the coronavirus fits squarely within the definition of "facility-borne illness event."

Unable to avoid the clear Policy language and the undisputed facts, Chubb has therefore resorted to advancing extra-contractual requirements for "facility-borne illness" coverage that simply do not appear in the four corners of the Policy.  In particular, Chubb argues that the Policy should be essentially rewritten to require additional coverage requirements that the facility must be the "source" of the virus and the virus must be "generated in the facility itself," rather than being brought into the facility by infected patients.  This is wrong.  If Chubb intended to add these additional hurdles to the definition, it could have done so when it drafted the Policy.  It chose not to do so, and cannot now after the fact rewrite its own Policy for which Northwell paid a substantial premium.

Further, in its effort to deny coverage, Chubb has also argued that COVID-19 is not covered because it is purportedly not the type of illness that can be acquired by patients as a result of receiving health care.  But Northwell has incurred significant costs to decontaminate its facilities precisely because the virus that causes COVID-19 presents a serious and ongoing danger of infecting or re-infecting patients as well as the health care workers who treat them, who rely on the use and re-use of critical medical facilities such as ventilators, personal protective equipment, and other facilities that are necessary to treat COVID-19.  Chubb's attempt to deny coverage on this basis only further highlights that the virus and COVID-19 fall squarely within the facility-borne illness coverage contemplated by both parties.

As demonstrated by this motion, Chubb's denial of "facility-borne illness" coverage fails as a matter of law as it finds no support in the Policy language and upends Northwell's reasonable expectations when it purchased coverage under a Healthcare Premises Pollution

Liability Policy.  Accordingly, the Court should grant Northwell's motion for summary judgment and find that the coronavirus meets the Policy's definition of "facility-borne illness event."

## STATEMENT OF MATERIAL FACTS

### A.    The Parties and Their Contractual Relationship

Northwell is New York State's largest health care provider and private employer, with numerous hospitals and outpatient facilities, and cares for more than two million people annually in the metro New York area and beyond.  56.1 ¶ 1.[4]  When the pandemic arrived in the New York area, Northwell responded to meet it and treat its patients.  *Id.* ¶ 2.  As of mid-July, Northwell's health system had cared for more COVID-19 patients than any other organization in the United States.  *Id.*

All of Northwell's employees have been on the front lines in a war to contain COVID-19's spread and save the lives of New Yorkers, administering tests, monitoring those infected but not requiring hospitalization, and doing everything in their power to heal those requiring inpatient treatment in hospital rooms or intensive care units, whether by providing the direct medical care or the administrative or facilities support.  56.1 ¶ 3.  Northwell relies upon critical medical facilities to treat COVID-19, including ventilators and other equipment that must be sterilized before they can be safely used.  *Id.* ¶ 4.  Northwell has been providing care, all while dealing with numerous, and evolving, mandates from local, state, and federal health authorities as to how to clean, decontaminate, or otherwise remediate its facilities and equipment to prevent the spread of coronavirus and avoid infection among other patients at the facilities or its employees.  *Id.* ¶ 5.

---

[4] The material facts consist of facts that Chubb has admitted, facts that are supported by the declaration of Maggie Emma, or facts available from public record.

4

Northwell purchased insurance coverage for precisely this circumstance. Northwell is insured under a Healthcare Premises Pollution Liability Insurance Policy, Policy No. HPI G27376939 002, covering the time period April 25, 2017 through April 25, 2020. 56.1 ¶ 6 (citing the Policy at p. 2 of 62). The Policy provides $20 million in coverage per occurrence and in the aggregate. *Id.* The Policy affords coverage to Northwell for costs expended in response to emergencies and to decontaminate its facilities in response to "facility-borne illness events" and broadly defined "pollution conditions," including remediation costs, emergency response coverage, decontamination costs, and catastrophe management costs. *Id.* at pp. 6-7 of 62. It also provides coverage for business interruption losses caused by "covered pollution conditions." The following chart provides a summary of the types of costs and losses covered under the Policy that may be implicated by the coronavirus pandemic:

| **Type of Coverage** | **Description** | **Coverage Triggered By** |
|---|---|---|
| First-Party Remediation Costs | Remediation costs and associated legal defense expenses | Pollution Condition |
| First Party Emergency Response Coverage | Emergency response costs, including remediation costs or decontamination costs, incurred within 72 hours following the discovery of a pollution condition or facility-borne illness event | Pollution Condition; or Facility-Borne Illness Event |
| Decontamination Costs Coverage | Reasonable and necessary expenses incurred following the discovery of a facility-borne illness event | Facility-Borne Illness Event |
| Business Interruption and Delay Expense Coverage | Business interruption loss, including business income and extra expense | Pollution Condition |
| Catastrophe Management Costs Coverage | Reasonable and necessary expenses arising out of a catastrophe management event | Pollution Condition; or Facility-Borne Illness Event |

As a prerequisite to the above coverage, Northwell must have suffered a "facility-borne illness event" or a "pollution condition." Policy at p. 2 of 62. "Facility-borne illness event" is defined as:

[T]he presence of a facility-borne infectious **virus**, bacteria or disease at a "covered location"; provided that such facility-borne infectious virus, bacteria or disease is not:

> **1.** Naturally occurring in the environment in amounts and concentrations discovered at the "covered location"; and

> **2. Solely** or exclusively the result of communicability through human-to-human contact.

*Id.* at p. 12 of 62 (emphases added).[5]

The Policy therefore contains only one contractual exception for otherwise covered facility-borne illnesses. In order to be excepted from the definition of "facility-borne illness event," a facility-borne illness must meet two conditions. First, to be excepted, the otherwise covered the facility-borne virus or disease must be "[n]aturally occurring in the environment in amounts and concentrations discovered at the 'covered locations.'" Policy at p. 12 of 62. Second, to be excepted, it must also be "[s]olely or exclusively the result of communicability through human-to-human contact." *Id.*

### B.    Northwell's Claim and Chubb's Denial of Coverage

In early April, Northwell provided Chubb with notice of its claim. 56.1 ¶ 10. After providing notice, Northwell did not hear from Chubb until May 20, 2020 when Chubb informed

---

[5] The Policy also broadly defines "pollution condition" in relevant part as:

> **1.** The presence of "fungi" or *legionella pneumophila*; [or]
> **3.** The discharge, dispersal, release, escape, migration, or seepage of any solid, liquid, gaseous or thermal irritant, contaminant, or pollutant, including smoke, soot, vapors, fumes, acids, alkalis, chemicals, hazardous substances, hazardous materials, or waste materials on, in, into, or upon land and structures thereupon, the atmosphere, surface water, or groundwater.
> For the purpose of this definition, waste materials include, but are not limited to, "low-level radioactive waste", "mixed waste" and medical, red bag, infectious or pathological wastes.

Policy at p. 14 of 62.

Northwell via letter that it was denying coverage in full ("May 20 Letter").  *Id.* ¶ 11.  The initial stated reason for Chubb's denial was that Northwell's claim "does not involve a 'pollution condition' or a 'facility-borne illness event.'"  *Id.* ¶ 12.  According to Chubb's May 20 Letter, there was not a "pollution condition" because "COVID-19 is an infectious communicable disease caused by a virus, not pollution."  *Id.*  Chubb then concluded, without any analysis of the actual Policy terms, that there was not a "facility-borne illness event" because that kind of event is "generated in the facility itself," and COVID-19 "is communicable through human-to-human contact."  *Id.*

Northwell responded promptly to Chubb's May 20 Letter on May 29, 2020, noting that it disagreed with *all* of the positions in Chubb's May 20 Letter.  56.1 ¶ 13.  In an effort, however, to narrow the breadth of its dispute with Chubb, Northwell focused only on Chubb's decision that Northwell had not suffered a "facility-borne illness event."  *Id.* ¶ 14.  In particular, citing to the actual language contained in the Policy, Northwell contended that the Policy does not eliminate coverage for *all* human-to-human communicable illnesses; rather, it only limits coverage for those illnesses that are "*solely* or *exclusively* the result of communicability through human-to-human contact."  *Id.* ¶¶ 9, 15 (emphasis added).  Northwell further provided Chubb with conclusive scientific evidence, including evidence from the WHO, demonstrating that the novel coronavirus can survive on surfaces and infect humans who contact those surfaces, and therefore the virus is not solely communicable through human-to-human contact.  *Id.* ¶ 15.  In particular, Northwell drew Chubb's attention to the WHO's latest guidance on the COVID-19 pandemic, which is designed to provide the worldwide public with the most elementary information about COVID-19 and the virus that causes it.  The WHO states:

> People with the virus in their noses and throats *may leave infected droplets on*
> *objects and surfaces (called fomites) when they sneeze, cough on, or touch*

> *surfaces, such as tables, doorknobs and handrails. Other people may become infected by touching these objects or surfaces, then touching their eyes, noses or mouths before cleaning their hands*.
>
> This is why it is essential to thoroughly clean hands regularly with soap and water or an alcohol-based hand rub product, **and to clean surfaces regularly**.[6]

*Id.* ¶ 22 (emphasis added).  The WHO's guidance is consistent with the information provided to the New York public by the New York State Department of Health:

> While the initial transmission is believed to have been animal-to-person spread, COVID-19 is now spreading from person-to-person.  This is thought to occur via respiratory droplets produced when a person infected with the virus coughs or sneezes, the same way flu and other respiratory illnesses spread.  **The virus that causes COVID-19 can also be transmitted if people touch surfaces and objects with the virus on it.**[7]

56.1 ¶ 24 (emphasis added).  Northwell also pointed Chubb to research published in the New England Journal of Medicine that indicates the virus can survive for at least 72 hours on plastic or stainless steel, at least 24 hours on cardboard, and at least 4 hours on copper.  *Id.* ¶ 15.

Based on the conclusive evidence that the virus can be transmitted in ways other than human-to-human contact, Northwell asked Chubb to reconsider its position and requested a response from Chubb by June 10, 2020.  56.1 ¶ 16.  Chubb did not respond.  On June 16, Northwell followed up to see why Chubb had gone "radio silent."  *Id.* ¶ 17.  Finally, on July 9, 2020, Northwell received a letter from Chubb's outside coverage counsel.

Tellingly, Chubb's counsel *agreed* with Northwell on the common usage of the term "facility-borne," acknowledging that "the term 'facility-borne' is commonly understood as having been transported or transmitted by the facility."  56.1 ¶ 19.  Chubb also *agreed* with

---

[6] https://www.who.int/emergencies/diseases/novel-coronavirus-2019/question-and-answers-hub/q-a-detail/q-a-how-is-covid-19-transmitted, "How is COVID-19 transmitted?" (last accessed on September 18, 2020).

[7] https://coronavirus.health.ny.gov/system/files/documents/2020/04/doh_covid19_faqs_updated_041720_2.pdf, "COVID-19 Frequently Asked Questions" (last accessed on September 18, 2020).

Northwell that COVID-19 can transmit from contact with non-human sources, such as surfaces, stating that "Chubb does not currently contend that human-to-human contact is the sole or exclusive method of transmission." *Id.* Despite *admitting* all the basic facts that would compel coverage, Chubb nonetheless adhered to its initial position that COVID-19 did not constitute a "facility-borne illness event." *Id.* ¶ 18. Rather, it claimed for the first time that Northwell had failed to satisfy purported additional extra-contractual requirements for coverage that are *not* found in the Policy itself. *Id.* ¶ 21. Chubb claimed that in order for "facility-borne illness" coverage to exist "the facility must be the source of the virus" that cannot be "brought in from outside the facility by infected persons." *Id.* For instance, according to Chubb, coverage existed only for infectious viruses and diseases that are "acquired as a result of receiving health care." *Id.* Faced with Chubb's denial notwithstanding the clear Policy language and undisputed facts showing Northwell's entitlement to coverage, Northwell was left with no choice but to file this action.

## ARGUMENT

### I.    LEGAL STANDARDS

A movant is entitled to summary judgment where "the pleadings, depositions, answers to interrogatories, and the admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (citing Fed. R. Civ. P. 56). "While the moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact, the party opposing summary judgment must do more than simply show that there is some metaphysical doubt as to the material facts." *Mason Tenders Dist. Council Welfare*

9

*Fund v. Kafka Constr., Inc.*, No. 16 Civ. 9911 (KPF), 2018 WL 2138621, at *3 (S.D.N.Y. May 9, 2018) (citations and internal quotation marks omitted).

Under New York law,[8] "[i]nsurance policies are, in essence, creatures of contract, and, accordingly subject to principles of contract interpretation." *In re Estates of Covert*, 97 N.Y.2d 68, 76 (2001). The meaning of a contract is a question of law for the court to determine. *White v. Cont'l Cas. Co.*, 9 N.Y.3d 264, 267 (2007). nI determining meaning, "unambiguous provisions of an insurance contract" are given "their plain and ordinary meaning." *Selective Ins. Co. of Am. v. County of Rensselaer*, 26 N.Y.3d 649, 655 (2016). "When contract language is unambiguous, 'the district court [may] construe it as a matter of law and grant summary judgment accordingly.'" *AGCS Marine Ins. Co. v. World Fuel Servs., Inc.*, 220 F. Supp. 3d 431, 436 (S.D.N.Y. 2016) (quoting *Palmieri v Allstate Ins. Co.*, 445 F.3d 179, 187 (2d Cir. 2006)).

Insurance contracts must be interpreted according to "common speech" and consistent with the "reasonable expectations" of the average insured. *See Belt Painting Corp. v. TIG Ins. Co.*, 100 N.Y.2d 377, 383 (2003). In particular, undefined terms in an insurance policy must be construed consistently with "common speech" and the insured's "reasonable expectations." *See, e.g.*, *Belt Painting*, 100 N.Y.2d at 383; *Brown Bros. Elec. Contrs. v. Beam Constr. Corp.*, 41 N.Y.2d 397, 400 (1977) ("[T]he aim is a practical interpretation of the expressions of the parties to the end that there be a realization of [their] reasonable expectations."). New York courts consistently look to dictionary definitions to determine the plain meaning of policy language. *See, e.g.*, *CT Inv. Mgmt. Co., LLC v. Chartis Specialty Ins. Co.*, 9 N.Y.S.3d 220, 224 (1st Dep't 2015).

---

[8] The choice of law provision in the Policy provides that "[a]ll matters arising hereunder, including questions relating to the validity, interpretation, performance, and enforcement of this Policy, and the rights, duties and obligations hereunder, shall be determined in accordance with the law and practices of the State of New York." Policy at p. 23 of 62.

Like any contract, an insurance policy "should not be interpreted to produce an absurd result, one that is commercially unreasonable, or one that is contrary to the intent of the parties." *Cole v. Macklowe*, 953 N.Y.S.2d 21, 23 (1st Dep't 2012). Courts must construe the policy in a way that "affords a fair meaning to all of the language employed by the parties in the contract and leaves no provision without force and effect." *In re Viking Pump, Inc.*, 27 N.Y.3d 244, 257 (2016). If there is any ambiguity in the policy language, it must be resolved against the insurer and in favor of coverage. *See World Fuel Servs., Inc.*, 220 F. Supp. 3d at 436 ("[I]f policy language is ambiguous, New York law provides that such ambiguities must be construed in favor of the insured and against the insurer."). Any arguably reasonable reading of the policy in favor of the policyholder controls as a matter of law. *See Nat'l Football League v. Vigilant Ins. Co.*, 824 N.Y.S.2d 72, 76 (1st Dep't 2006) (insured's "plausible interpretation" supporting coverage "must be sustained").

The rules safeguarding the reasonable expectations of the insured are especially rigorous in the context of exceptions or exclusions. Under well-established New York law, the insurer bears the "heavy burden" of proving that claims fall entirely and unambiguously within any exclusion, which must be interpreted strictly and narrowly in favor of coverage. *Belt Painting*, 100 N.Y.2d at 383. Policy exclusions "are not to be extended by interpretation or implication, but are to be accorded a strict and narrow construction" and will not be interpreted to make the coverage provided by the policy illusory. *Seaboard Sur. Co. v. Gillette Co.*, 64 N.Y.2d 304, 311 (1984); *see also Thomas J. Lipton, Inc. v. Liberty Mut. Ins. Co.*, 34 N.Y.2d 356, 361 (1974) (rejecting an insurer's interpretation of an exclusion because the interpretation would render the

11

coverage nearly illusory).[9]   Indeed, an insurer must establish that the exclusion is clear and unmistakably is subject to no other reasonable interpretation, and applies in the particular case. *See Cont'l Cas. Co. v. Rapid-Am. Corp.*, 80 N.Y.2d 640, 652 (1993).

## II.   AS A MATTER OF LAW, NORTHWELL HAS SUFFERED A "FACILITY-BORNE ILLNESS EVENT"

Northwell has suffered a "facility-borne illness event" and is entitled to such a ruling as a matter of law for three essential reasons:  (1) the virus that causes COVID-19 is "facility-borne" based on the common understanding of the word and the undisputed facts about the virus's transmission, which both parties agree on; (2) the one contractual exception to the definition of "facility-borne illness event" does not apply; and (3) the additional extra-contractual requirements for "facility-borne illness events" posed by Chubb are not required by the Policy and fail as a matter of law.

### A.   SARS-CoV-2, the Virus that Causes COVID-19, is "Facility-Borne"

By the unambiguous meaning of the word, SARS-CoV-2, the virus that causes COVID-19, is "facility-borne."  Although the term "facility-borne" is not defined in the Policy, the parties are in agreement on its common usage.  "Facility" is defined as "something (such as a hospital) that is built, installed, or established to serve a particular purpose."  *Facility*, Merriam Webster Dictionary; *see also* 56.1 ¶ 21 (citing Chubb's July 9, 2020 letter at 2).  There can be no question that all of Northwell's covered locations, as well as the amenities and equipment it uses at those covered locations, readily qualify as "facilities."  The dictionary defines "borne" as "transported or transmitted by."  *Borne*, Merriam Webster Dictionary.  A reasonable insured reading the term "facility-borne" would understand coverage would be provided where the

---

[9] *See also Century Sur. Co. v. All In One Roofing, LLC*, 63 N.Y.S.3d 406, 409–10 (2d Dep't 2017) (exclusions must be "strictly construed and read narrowly").

facility itself, not just people, can bear the virus. Chubb agrees. 56.1 ¶ 20 ("'Facility-borne' is commonly understood as having been transported or transmitted by the facility.").

Further, Chubb does not contest the fact that the coronavirus is capable of transmission from surfaces, as distinct from human-to-human contact. 56.1 ¶ 19 (citing Chubb's July 9, 2020 letter at 2). In fact, in its prior correspondence, Chubb makes clear that it "does not currently contend that human-to-human contact is the sole or exclusive method of transmission." *Id.* Therefore, the contractual exception that limits coverage for facility-borne infectious viruses and diseases that are "*solely* or *exclusively* the result of communicability by human-to-human contact" does not apply.[10]

Even if Chubb had not made this concession – which it did – the Court can properly consider and take judicial notice of the materials issued to the public by reputable health organizations and government agencies. It is well established that "[c]ourts routinely take judicial notice of [] governmental records" such as "documents retrieved from official government websites." *Wells Fargo Bank, N.A. v. Wrights Mill Holdings, LLC*, 127 F. Supp. 3d 156, 166 (S.D.N.Y. 2015); *see also Christa McAuliffe Intermediate Sch. PTO, Inc. v. De Blasio*, 364 F. Supp. 3d 253, 2626 (S.D.N.Y. 2019) (taking judicial notice of "information published by the DOE [Department of Education] and available on a government website"). In this case, the facts establishing the ability of the coronavirus to live on and transmit from surfaces come from the WHO, an international agency of the United Nations responsible for directing international

---

[10] In denying coverage, Chubb has never claimed that the first requirement of the exception has been met, *i.e.*, that COVID-19 or SARS-CoV-2 are naturally occurring in the environment in amounts and concentrations discovered at Northwell's covered facilities. Nor could it, as Northwell as a front line health care provider has been at the center of coronavirus outbreak in New York and the surrounding areas, and coronavirus very literally arrives in Northwell's facilities every single day and must be assumed to be present in the air and on surfaces at all times.

health and spearheading global health responses, as well as information published by the New York State Department of Health, New York's state agency responsible for the state's public health.  56.1 ¶¶ 22-24.

Accordingly, application of the undisputed facts to the express Policy language demonstrates that SARS-CoV-2 meets the definition of a "facility-borne" virus.

### B.   Chubb's Additional Requirements for Coverage for "Facility-Borne Illnesses" Fail As A Matter of Law

Faced with the fact that the coronavirus does not fall within the one exception, Chubb issued a new blanket denial of coverage by imposing no less than three additional extra-contractual requirements for "facility-borne illness events," including requirements that: (i) the facility must be the "source" of the virus; (ii) the virus cannot be brought into the facility by infected patients; and (iii) the illness must be of the type "acquired as a result of receiving health care."  56.1 ¶ 21.  However, Chubb did not and cannot point to any requirement in the Policy or any ordinary use of the term "facility-borne" that would mandate Northwell clear these additional hurdles to coverage.

Chubb has posited that these additional coverage requirements are necessary because otherwise "coverage could be triggered for any infectious virus, bacteria, or disease found at a facility and would impermissibly write the term 'facility-borne' out of the Policy."  56.1 ¶ 21 (citing Chubb's July 9, 2020 letter at 3).  That position has no merit.  The coronavirus is not just any infectious virus or disease.  It is not the flu.  It is not a run-of-the-mill common cold.  It is an outbreak of a novel virus and disease, one that was declared a worldwide pandemic as early as March, that has caused a crushing influx of patients, scarcity of supplies, and threatened the safety of Northwell's health care workers, who risk their lives daily to treat their patients.  It is

exactly the type of circumstance where Northwell reasonably expected insurance coverage under its Healthcare Premises Pollution Liability Policy.

The coverage Northwell seeks is also exactly the coverage Chubb agreed to and for which Northwell bargained for.  When issuing the Policy, Chubb knew how to limit coverage when it wanted to.  As discussed above, Chubb went out of its way to insert an exception in the Policy for otherwise covered facility-borne illnesses.  In that exception, Chubb did not include any of the additional coverage requirements it now seeks to impose.  Chubb's concern that coverage will be too broad if it insures Northwell's costs and losses resulting from the coronavirus does not justify departing from the clear text of the Policy.  Chubb cannot now ask the Court to enforce a Policy it wished it had written as opposed to the coverage it agreed to provide.  *See, e.g.*, *City of New York v. Phil. Indem. Ins. Co.*, 864 N.Y.S.2d 454, 456 (2d Dep't 2008) (rejecting "the interpretation favored by the defendant" where "[s]uch an interpretation would rewrite the policy without regard to the plaintiff's reasonable expectations as expressed in the contract").

Putting aside the fact that the additional coverage requirements raised by Chubb do not appear in the black and white text of the Policy, even if the Court were to accept Chubb's extra-contractual requirements for coverage, they still do not act to bar coverage for two reasons. First, the example Chubb provided in its July 9 letter of the type of illness that would trigger coverage under the Policy only further shows that coverage is also available for Northwell's costs and losses resulting from the coronavirus.  In its second denial letter, Chubb admitted that an illness like Hepatitis was a contemplated covered facility-borne illness because it is "an infectious, blood-borne virus acquired as a result of receiving health care."  56.1 ¶ 21 (citing Chubb's July 9, 2020 letter at 3).  But following Chubb's reasoning, there is no principled or

meaningful difference between an illness like Hepatitis and an illness like COVID-19, which can be spread and transmitted through Northwell's facilities to health care workers and patients alike while patients are receiving health care.  The easy transmission of the coronavirus during the administration and receipt of health care is a particularly staggering threat precisely because it is facility-borne and can be transmitted through objects or medical equipment, and it often necessitates medical intervention through the use and re-use of scarce supplies, equipment, and other facilities such as ventilators.  In fact, the WHO has notified the public that there are, indeed, some medical procedures that can further spread COVID-19 if proper precautions are not taken:

> Some medical procedures can produce very small droplets (called aerosolized droplet nuclei or aerosols) that are able to stay suspended in the air for longer periods of time. When such medical procedures are conducted on people infected with COVID-19 in health facilities, these aerosols can contain the COVID-19 virus. These aerosols may potentially be inhaled by others if they are not wearing appropriate personal protective equipment.

56.1 ¶ 23.  Thus, even if it were the case that coverage is only available for illnesses that can be acquired in Northwell's facilities during the receipt of health care, COVID-19 nonetheless readily satisfies this requirement.

Second, accepting Chubb's requirement that a facility-borne illness must be an illness that is "generated in the facility" and not brought into the facility would run afoul of the well-settled principle that insurance contracts should not be read in a manner that renders coverage illusory.  *See Thomas J. Lipton, Inc.*, 34 N.Y.2d at 361; *Lend Lease (US) Constr. LMB Inc. v. Zurich Am. Ins. Co.*, 28 N.Y.3d 675, 684-85 (2017) (citing *Lipton* and explaining that under New York law, insurance policies cannot be interpreted such that coverage is rendered illusory).  All infectious viruses, bacteria, or diseases would necessarily be initially brought into one of Northwell's facilities from some outside source.  Indeed, even the "blood-borne" Hepatitis,

16

which Chubb admits would be a covered illness, would not meet the rigorous definition of a "facility-*generated*" illness.  Thus, because it would render coverage illusory, the Court should reject Chubb's attempt to impose additional requirements for "facility-borne illness events" not found in the Policy.

## CONCLUSION

For the reasons set forth above, Northwell respectfully requests that the Court enter partial summary judgment in Northwell's favor and find that the coronavirus meets the Policy definition of a "facility-borne illness event."

Dated: New York, New York
September 18, 2020

MCKOOL SMITH, P.C.

/s/ Robin L. Cohen
Robin L. Cohen
Alexander M. Sugzda
Cynthia Jordano
One Manhattan West
395 9th Avenue, 50th Floor
New York, New York 10001
Tel: (212) 402-9400
Fax: (212) 402-9444
rcohen@mckoolsmith.com
asugzda@mckoolsmith.com
cjordano@mckoolsmith.com

*Attorneys for Plaintiff Northwell Health, Inc.*

17