**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| NORTHWELL HEALTH, INC., | Civil Action No. 20 Civ. 06893 (LTS)(OTW) |
| Plaintiff, | |
| v. | |
| ILLINOIS UNION INSURANCE COMPANY, | ORAL ARGUMENT REQUESTED |
| Defendant. | |

**PLAINTIFF NORTHWELL HEALTH, INC.'S MEMORANDUM OF LAW IN**
**OPPOSITION TO DEFENDANT'S MOTION TO DISMISS**

MCKOOL SMITH, P.C.
Robin L. Cohen
Alexander M. Sugzda
Cynthia Jordano
One Manhattan West
395 9th Avenue, 50th Floor
New York, New York 10001
Tel: (212) 402-9400
Fax: (212) 402-9444

*Attorneys for Plaintiff Northwell Health, Inc.*

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................1

STATEMENT OF FACTS ....................................................................................4

    A.    Northwell's Significant Costs and Losses ...................................4

    B.    The Policy ..................................................................................5

    C.    Northwell's Claim and Chubb's Denial of Coverage ................6

STANDARD OF REVIEW ...................................................................................9

    I.    Standards on a Motion to Dismiss.............................................9

    II.    The Standards Applicable to Interpretation of an Insurance Policy.....................10

ARGUMENT .....................................................................................................12

    I.    Northwell Has Sufficiently Pled its Breach of Contract Claim and Declaratory Judgment Claim.............................................12

    A.    Northwell Has Alleged a "Facility Borne Illness Event" .........12

    B.    Northwell Adequately Alleges a "Pollution Condition"............16

    C.    The Complaint Sufficiently Pleads Northwell's "Costs" and "Losses" ....18

    D.    The Complaint Sufficiently Pleads Northwell's Compliance with Conditions Precedent to Coverage............................................20

    II.    Northwell Has Stated a Claim for Breach of the Implied Covenant of Good Faith and Fair Dealing ........................................................21

    III.    Northwell Sufficiently Pleads Its General Business Law § 349 Claim.................24

    IV.    If Necessary, Northwell Should Be Granted the Opportunity to Amend..............27

CONCLUSION...................................................................................................28

i

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*40 Gardenville, LLC v. Travelers Prop. Cas. of Am.*,
   387 F. Supp. 2d 205 (W.D.N.Y. 2005) ................................................................14

*AGCS Marine Ins. Co. v. World Fuel Servs., Inc.*,
   220 F. Supp. 3d 431 (S.D.N.Y. 2016) ................................................................11

*ASARCO LLC v. Goodwin*,
   756 F.3d 191 (2d Cir. 2014) ...............................................................................10

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009) .............................................................................................9

*Belt Painting Corp. v. TIG Ins. Co.*,
   100 N.Y.2d 377 (2003) .........................................................................10, 11, 17

*Bi-Economy Mkt., Inc. v. Harleysville Ins. Co. of N.Y.*,
   10 N.Y.3d 187 (2008) .........................................................................................22

*Brown Bros. Elec. Contractors. v. Beam Constr. Corp.*,
   41 N.Y.2d 397 (1977) .........................................................................................10

*Chenensky v. N.Y. Life Ins. Co.*,
   No 07 Civ. 11504 (WHP), 2012 WL 234374 (S.D.N.Y. Jan. 10, 2012) ...............27

*Cole v. Macklowe*,
   953 N.Y.S.2d 21 (1st Dep't 2012) .....................................................................11

*Colonial Oil Indus. Inc. v. Indian Harbor Ins. Co.*,
   528 F. App'x 71 (2d Cir. 2013) ..........................................................................17

*Consol. Edison Co. of N.Y. v. Allstate Ins. Co.*,
   98 N.Y.2d 208 (2002) .........................................................................................14

*Cont'l Cas. Co. v. Rapid-Am. Corp.*,
   80 N.Y.2d 640 (1993) ...........................................................................11, 12, 17

*CT Inv. Mgmt. Co., LLC v. Chartis Specialty Ins. Co.*,
   9 N.Y.S.3d 220 (1st Dep't 2015) .......................................................................10

*D.K. Prop., Inc. v. Nat'l Union Fire Ins. Co. of Pittsburgh, Pa.*,
   92 N.Y.S.3d 231 (1st Dep't 2019) ...............................................................22, 24

*Endemann v. Liberty Ins. Corp.*,
    390 F. Supp. 3d 362 (N.D.N.Y. 2019)..................................................................25

*Eternity Glob. Master Fund Ltd. v. Morgan Guar. Tr. Co. of N.Y.*,
    375 F.3d 168 (2d Cir. 2004)............................................................................9

*Evergreen Line A Joint Serv. Agmt. FMC No. 011982 v. US Dynamics Recycling LLC*,
    No. 18 Civ. 313 (AKH), 2018 WL 6313607 (S.D.N.Y. June 12, 2018) ..................21

*Fed. Ins. Co. v. Am. Home Assur. Co.*,
    639 F.3d 557 (2d Cir. 2011)..........................................................................13

*Galper v. JP Morgan Chase Bank, N.A.*,
    802 F.3d 437 (2d Cir. 2015)..........................................................................10

*In re Estates of Covert*,
    97 N.Y.2d 68 (2001) ..................................................................................10

*In re Viking Pump, Inc.*,
    27 N.Y.3d 244 (2016) .................................................................................11

*Joannou v. Blue Ridge Ins. Co.*,
    289 A.D.2d 531 (2d Dep't 2001) ....................................................................25

*Kronenberg v. Allstate Ins. Co.*,
    No. 18 Civ.6899(NGG)(JO), 2020 WL 1234603 (E.D.N.Y. Mar. 13, 2020)............24

*Kurschner v. Mass. Cas. Ins. Co.*,
    No. 08 Civ. 0011 (JFB)(AKT), 2009 WL 537504 (E.D.N.Y. Mar. 3, 2009) ........25, 26

*Mauricio Martinez, DMD, P.A. v. Allied Ins. Co.*,
    No. 20 Civ. 00401, 2020 WL 5240218 (M.D. Fla. Sept. 2, 2020) ........................20

*Nat'l Football League v. Vigilant Ins. Co.*,
    824 N.Y.S.2d 72 (1st Dep't 2006) ..................................................................11

*Nat'l R.R. Passenger Corp. v. Arch Specialty Ins. Co.*,
    124 F. Supp. 3d 264 (S.D.N.Y. 2015)..............................................................24

*N.Y. Univ. v. Cont'l Ins. Co.*,
    87 N.Y.2d 308 (1995) .................................................................................25

*Nick's Garage, Inc. v. Progressive Cas. Ins. Co.*,
    875 F.3d 107 (2d Cir. 2017)......................................................................26, 27

*Niesenbaum v. AXA Equitable Life Ins. Co.*,
    No. 600412/2013, 2015 WL 10478082 (N.Y. Sup. Ct. Mar. 12, 2015) ................23

*O.K. Petroleum v. Travelers Indem. Co.*,
No. 09 Civ. 10273 (LMM), 2010 WL 2813804 (S.D.N.Y. July 15, 2020) ...........................25

*Oppenheimer & Co., Inc. v. Trans Energy, Inc.*,
946 F. Supp. 2d 343 (S.D.N.Y. 2013)...............................................................................13

*Panasia Estates, Inc. v. Hudson Ins. Co.*,
10 N.Y.3d 200 (2008) ................................................................................................22, 23

*Pelman ex rel. Pelman v. McDonald's Corp.*,
396 F.3d 508 (2d Cir. 2005).............................................................................................24

*Random Ventures, Inc. v. Advanced Armament Corp., LLC*,
No. 12 Civ. 6792 (KBF), 2014 WL 113745 (S.D.N.Y. Jan. 13, 2014) ..................................22

*Raymond v. Marks*,
116 F.3d 466 (2d Cir. 1997)..............................................................................................21

*Riordan v. Nationwide Mut. Fire. Ins. Co.*,
977 F.2d 47 (2d Cir. 1992)................................................................................................26

*Seaboard Sur. Co. v. Gillette Co.*,
64 N.Y.2d 304 (1984) ......................................................................................................11

*Selective Ins. Co. of Am. v. County of Rensselaer*,
26 N.Y.3d 649 (2016) ......................................................................................................10

*SS&C Tech. Holdings, Inc. v. AIG Specialty Ins. Co.*,
No. 19 Civ. 7859 (JSR), 2019 WL 7816253 (S.D.N.Y. Nov. 6, 2019) ..................................22

*Thomas J. Lipton, Inc. v. Liberty Mut. Ins. Co.*,
34 N.Y.2d 356 (1974) ......................................................................................................11

*Turek Enters., Inc. v. State Farm Mut. Auto Ins. Co.*,
No. 20-11655, 2020 WL 5258484 (E.D. Mich. Sept. 3, 2020)...............................................20

*Utica Mut. Ins. Co. v. Fireman's Fund Ins. Co.*,
238 F. Supp. 3d 314 (N.D.N.Y. 2017) ...............................................................................22

*White v. Cont'l Cas. Co.*,
9 N.Y.3d 264 (2007) ........................................................................................................10

*Whiteface Real Estate Dev. & Constr., LLC v. Selective Ins. Co. of Am.*,
No. 08 Civ. 24 (GLS)(DRH), 2009 WL 1373735 (N.D.N.Y. May 13, 2009).........................25

**STATUTES**

N.Y. Gen. Bus. Law § 349........................................................................................... *passim*

N.Y. Ins. Law § 2601 .................................................................................................................26

**OTHER AUTHORITIES**

Merriam Webster Dictionary. .....................................................................................................13

Plaintiff Northwell Health, Inc. ("Northwell" or "Plaintiff"), submits this memorandum of law in opposition to Illinois Union Insurance Company's ("Chubb" or "Defendant") motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6).

## PRELIMINARY STATEMENT

This is an insurance coverage case in which one of the hospital and healthcare systems on the front lines of the coronavirus pandemic, Northwell, turns to this Court to compel its insurer, Chubb, to provide coverage for the significant costs and losses it has incurred as a result of the pandemic. These costs and losses—including costs to clean and disinfect Northwell's facilities, respond to evolving mandates from federal, state, and local health authorities, and grapple with losses from other aspects of its business—are plainly covered by the terms of the policy issued to Northwell by Chubb. Chubb has denied coverage and now seeks to dismiss Northwell's Complaint in this action. Chubb does not cite any cases that interpret the language of this specific pollution policy, and instead cites to inapplicable decisions interpreting COVID-19 claims under property policies that required physical loss or damage or contained an explicit virus exclusion. The pollution policy purchased by Northwell does not require physical loss or damage, and far from precluding coverage for viruses, it expressly affords coverage for them. Northwell has sufficiently pled every element required to be able to pursue its claims in this action. Accordingly, Chubb's motion to dismiss should be denied.

The rising costs and losses Northwell suffered, and continues to suffer, due to the coronavirus crisis, are precisely the costs and losses it purchased coverage for in the form of a Healthcare Premises Pollution Liability Insurance Policy (the "Policy") issued by Defendant. The Policy applies whenever there has been a broadly defined "facility-borne

illness event" or "pollution condition" at Northwell's premises, and affords coverage for, among other things, decontamination costs, emergency response costs, remediation costs, and business interruption loss.

Northwell's Complaint alleges that the coronavirus is "facility-borne" because it can be transported or transmitted by Northwell's facilities given its ability to survive on surfaces, and its transmission is not limited to human-to-human contact.   In its pre-complaint coverage letters, Defendant agreed with Northwell that the virus can spread on surfaces and is not solely or exclusively the result of communicability through human-to-human contact.   That is all that is required by the Policy to trigger facility-borne illness coverage.

To avoid its coverage obligations for facility-borne illness events and its prior admissions, Defendant raises brand new arguments for denying coverage that find no support in the four corners of the Policy.   Defendant has now staked the untenable position that Northwell's costs associated with an unprecedented global pandemic should be assumed by Northwell as part of its ordinary operating costs simply because the general population is infected at high levels.   Defendant's argument is based on a misreading of the Policy's one exception to facility-borne illness events, which states that an otherwise covered facility-borne illness will be excepted from coverage only if it is both:

> **1.** Naturally occurring in the environment in amounts and concentrations discovered at the "covered location"; **and**
>
> **2.** Solely or exclusively the result of communicability through human-to-human contact.

Compl. ¶ 45 (emphasis added).   Defendant has already conceded that communicability of the coronavirus is not limited to human-to-human contact, and therefore the exception does

2

not apply.   Under New York law, Defendant cannot avoid enforcement of the Policy as written, and its attempts to avoid the parties' bargained-for coverage should be rejected.

Northwell has further alleged the existence of a "pollution condition" sufficient to trigger coverage for its business interruption losses.   The Policy takes a broad view of "pollution conditions" and expressly covers waste, including infectious and pathological waste, that can be created by the treatment of COVID-19.   Northwell alleges that its business interruption losses are directly attributable to a "covered pollution condition," which occurs when government authorities address the proper remediation of Northwell's properties, as is the case here.

Defendant also raises factual issues in an effort to dismiss Northwell's Complaint. Defendant contends that Northwell failed to allege its costs and losses and failed to allege satisfaction with conditions precedent to coverage, including the Policy's self-insured retention and notice requirements.   Northwell's Complaint adequately alleges all requirements for coverage, and the factual issues raised by Defendant cannot be resolved as a matter of law on a motion to dismiss.

Defendant's challenges to Northwell's claims for breach of the implied covenant of good faith and fair dealing and violations of General Business Law § 349 fare no better. The issue of bad faith is a factual one, and Northwell sufficiently alleges that Defendant engaged in a pattern of bad faith and deceptive actions that include: (i) tactical shifts in coverage positions after Defendant admitted all the basic facts that would compel coverage; (ii) delays in processing Northwell's valid claim; and (iii) consumer-oriented conduct via its issuance of standard form policies to multiple policyholders.   Taken as true, Northwell's Complaint plausibly alleges claims for bad faith and deceptive practices.

3

In sum, Defendant is not entitled to dismiss any portion of Northwell's Complaint, and its motion should be denied.  Indeed, as Northwell demonstrated in its previously-filed motion for partial summary judgment, the only party entitled to relief as a matter of law is Northwell.

## STATEMENT OF FACTS

### A.    Northwell's Significant Costs and Losses

Northwell is New York State's largest health care provider and private employer, with numerous hospitals and outpatient facilities, and cares for more than two million people annually in the metro New York area and beyond.  Compl. ¶ 3.  When the coronavirus outbreak arrived in New York, Northwell and its employees rose to the occasion, working on the front lines in the war to contain COVID-19's spread and save the lives of their patients.  *Id.* ¶ 7.  As of mid-July, Northwell's health system had cared for more COVID-19 patients than any other organization in the United States.  *Id.* ¶ 3.

As a result of the coronavirus pandemic, Northwell has suffered significant costs and losses.  Compl. ¶¶ 8-11, 33-39.  Northwell has seen a significant rise in its decontamination and remediation costs while dealing with numerous, and evolving, mandates from local, state, and federal health authorities as to how to clean or otherwise remediate its facilities and equipment to prevent the spread of the coronavirus and avoid infection among other patients at the facilities or among its employees.  *Id.* ¶ 8.  Northwell transformed its facilities and operations to meet the threat of the coronavirus, creating more than 1,600 additional beds, securing personal protective equipment, and ensuring it had necessary staff ready around the clock.  *Id.* ¶ 35.  As a further example of its increased costs, Northwell has

used approximately 50 times more oxygen than ever before in treating the respiratory effects of COVID-19.  *Id.* ¶ 38.

While facing mounting costs to combat the coronavirus crisis, Northwell has simultaneously seen other aspects of its business grind to a halt or slow considerably, including the forced closure of private physician practices that operate out of Northwell facilities and the cessation of medical procedures described as elective.  Compl. ¶¶ 9-10, 32, 39.

### B.   The Policy

Northwell is insured under a Healthcare Premises Pollution Liability Insurance Policy, Policy No. HPI G27376939 002, which was in effect in early 2020 when the pandemic began. Compl. ¶ 12.  The Policy provides $20 million in coverage per occurrence and in the aggregate.  *Id.* ¶ 43.  Coverage under the Policy is triggered when Northwell suffers either a "facility-borne illness event" or a "pollution condition."  *Id.* ¶ 42.  "Facility-borne illness event" is defined as:

> [T]he presence of a facility-borne infectious **virus**, bacteria or disease at a "covered location"; provided that such facility-borne infectious virus, bacteria or disease is not:
>
> **1.** Naturally occurring in the environment in amounts and concentrations discovered at the "covered location"; **and**
>
> **2. Solely** or **exclusively** the result of communicability through human-to-human contact.

Compl. ¶ 45 (emphases added).   The Policy broadly defines "pollution condition" in relevant part as:

> **1.** The presence of "fungi" or *legionella pneumophila*; [or]
>
> **3.** The discharge, dispersal, release, escape, migration, or seepage of any solid, liquid, gaseous or thermal irritant, contaminant, or pollutant, including smoke, soot, vapors, fumes, acids, alkalis, chemicals, hazardous substances, hazardous

5

materials, or waste materials on, in, into, or upon land and structures thereupon, the atmosphere, surface water, or groundwater.

**For the purpose of this definition, waste materials include, but are not limited to**, "low-level radioactive waste", "mixed waste" and **medical, red bag, infectious or pathological wastes**.

Compl. ¶ 46 (emphasis added).

The Policy affords coverage for costs expended in response to emergencies and to decontaminate Northwell's facilities in response to "facility-borne illness events" and "pollution conditions," including remediation costs, emergency response coverage, decontamination costs, and catastrophe management costs. Compl. ¶¶ 44-52.

In addition to coverage for costs, the Policy provides coverage for business interruption loss that is directly attributable to a "covered pollution condition." Compl. ¶ 53. The Policy defines "covered pollution condition" as a "'pollution condition' on, at or under a 'covered location' for which coverage is otherwise afforded pursuant to this Policy pursuant to Coverages A. or B., only, for 'remediation costs' resulting from the first-party discovery of such 'pollution condition.'" Policy at 11 of 62. "Remediation costs" are "reasonable expenses incurred to investigate, quantify, monitor, mitigate, abate, remove, dispose, treat, neutralize, or immobilize 'pollution conditions' to the extent required by 'environmental laws'" within the definition of the Policy. Compl. ¶ 48. The Policy defines "environmental law" as "any federal, state, commonwealth, municipal or other local law, statute, directive, ordinance, rule, guidance document, regulation, and all amendments thereto, including voluntary cleanup or risk-based corrective action guidance." *Id.* ¶ 51.

### C. Northwell's Claim and Chubb's Denial of Coverage

Northwell gave prompt notice of its claim to Chubb, and then waited for nearly two months for Chubb to provide its initial coverage position on Northwell's claim. Compl. ¶

6

59. On May 20, 2020, Defendant provided its initial coverage position by letter, and stated that "coverage is not available for the referenced Claim." *Id.* ¶ 60. In particular, Defendant asserted that Northwell's claim "does not involve a 'pollution condition' or 'facility-borne illness event.'" *Id.* ¶ 61. Defendant stated that there was not a "pollution condition" because "COVID-19 is an infectious communicable disease caused by a virus, not pollution." *Id.* Defendant then stated that there was not a "facility-borne illness event" because, according to Defendant, such an event is "generated in the facility itself," and COVID-19 is "communicable through human-to-human contact." *Id.* ¶ 62.

Northwell responded to Defendant's May 20, 2020 letter promptly on May 29, 2020. Compl. ¶ 63. Northwell noted that it disagreed with all of the positions taken by Defendant, but in an effort to determine the breadth of the parties' dispute, focused only on Defendant's decision that Northwell had not suffered a "facility-borne illness event." *Id.* Northwell responded that under the dictionary definition of the term "facility-borne," an illness is "facility-borne" where the facility itself, and not just people, can spread the virus. Dkt. 19-3 (May 29, 2020 letter).[1] Northwell also provided Defendant with conclusive scientific evidence demonstrating that the coronavirus can survive on surfaces and infect people who come into contact with those surfaces, demonstrating that the virus is not *solely* or *exclusively* the result of communicability through human-to-human contact, as required by the Policy exception. Compl. ¶ 64.

In particular, Northwell directed Defendant's attention to the World Health Organization's ("WHO") latest guidance on the COVID-19 pandemic, in which the WHO

---

[1] The parties' pre-complaint correspondence, including the May 29, 2020 letter, is attached to the Declaration of Robin L. Cohen, submitted in support of Northwell's previously-filed motion for summary judgment. The court can properly consider the parties' coverage letters as they are incorporated by reference in Northwell's Complaint. Compl. ¶¶ 59-67.

cautioned the public that the disease could spread through droplets that landed on objects or surfaces when people touch those objects or surfaces.  Dkt. 19-3 (May 29, 2020 letter).  Northwell also pointed Defendant to research published in the New England Journal of Medicine that indicates the virus can survive for at least 72 hours on plastic or stainless steel, at least 24 hours on cardboard, and at least 4 hours on copper, which are all materials present at Northwell's facilities.  *Id.*

Northwell's Complaint goes into even further detail on the numerous scientific studies and articles finding that the virus spreads through objects and surfaces.  Compl. ¶¶ 24-27.  The studies show that unlike many viruses that are unable to survive for long periods of time outside the body, the novel coronavirus is remarkably resilient and can survive on surfaces for days, and even weeks.  *Id.* ¶ 28.

Based on the scientific evidence that the virus can be transmitted by means other than human-to-human contact, Northwell asked Defendant to reconsider its position and respond by June 10, 2020.  Compl. ¶ 65.  Defendant did not respond.  On June 16, 2020, Northwell followed up to see why Defendant had gone "radio silent."  *Id.*

When Defendant finally responded on July 9, 2020, it *agreed* with Northwell on the common usage of the term "facility-borne," acknowledging that "the term 'facility-borne' is commonly understood as having been transported or transmitted by the facility."  Dkt. 19-5 (July 9, 2020 letter).  Defendant also agreed with Northwell that COVID-19 can transmit from contact with non-human sources, such as surfaces, stating that "Chubb does not currently contend that human-to-human contact is the sole or exclusive method of transmission."  *Id.*  In other words, Defendant agreed with Northwell on all the policy terms and facts that would satisfy the coverage requirements for "facility-borne illness events."

8

Defendant nonetheless refused to reconsider its denial of coverage in full.  Compl. ¶ 66.  Instead, Defendant claimed that Northwell had failed to satisfy several additional extra-contractual requirements for coverage, which are not found in the text of the Policy.  Dkt. 19-5.  For example, Defendant claimed that in order for coverage to exist for "facility-borne" illnesses, "the facility must be the source of the virus" and it cannot be "brought in from outside the facility by infected persons."  *Id.*  Defendant further claimed for the first time that the only coverage contemplated by the Policy was for viruses and diseases that can be "acquired as a result of receiving healthcare."  *Id.*[2]

Because Defendant has not honored its contractual obligations to Northwell on its own, Northwell commenced this action to obtain the coverage it purchased.

## STANDARD OF REVIEW

## I.    STANDARDS ON A MOTION TO DISMISS

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  In determining if a complaint meets this standard, the court's task "is merely to assess the legal feasibility of the complaint, not to assay the weight of the evidence which might be offered in support thereof."  *Eternity Glob. Master Fund Ltd. v. Morgan Guar. Tr. Co. of N.Y.*, 375 F.3d 168, 176 (2d Cir. 2004).  Further, "the district court . . . is required to accept as true the facts alleged in the complaint, consider those facts in the light most favorable to the plaintiff, and

---

[2] The novel coronavirus, and the disease it causes, can be acquired as a result of receiving healthcare.  *See* Dkt. 16 (Northwell's Motion for Partial Summary Judgment) at 16; Dkt. 19-6 (WHO Q&A: How is COVID-19 transmitted?).

determine whether the complaint sets forth a plausible basis for relief." *Galper v. JP Morgan Chase Bank, N.A.*, 802 F.3d 437, 443 (2d Cir. 2015).

"In adjudicating a motion to dismiss, a court may consider only the complaint, any written instrument attached to the complaint as an exhibit, any statements or documents incorporated in it by reference, and any document upon which the complaint heavily relies." *ASARCO LLC v. Goodwin*, 756 F.3d 191, 198 (2d Cir. 2014).

## II.   THE STANDARDS APPLICABLE TO INTERPRETATION OF AN INSURANCE POLICY

Under New York law, "[i]nsurance policies are, in essence, creatures of contract, and accordingly, subject to principles of contract interpretation*." In re Estates of Covert*, 97 N.Y.2d 68, 76 (2001). The meaning of a contract is a question of law for the court to determine. *White v. Cont'l Cas. Co.*, 9 N.Y.3d 264, 267 (2007). In determining meaning, "[u]nambiguous provisions of an insurance contract" are given "their plain and ordinary meaning." *Selective Ins. Co. of Am. v. County of Rensselaer*, 26 N.Y.3d 649, 655 (2016).

Insurance contracts, and in particular undefined terms found within an insurance contract, must be interpreted according to "common speech" and consistent with the "reasonable expectations" of the average insured. *See Belt Painting Corp. v. TIG Ins. Co.*, 100 N.Y.2d 377, 383 (2003); *Brown Bros. Elec. Contractors. v. Beam Constr. Corp.*, 41 N.Y.2d 397, 400 (1977) ("[T]he aim is a practical interpretation of the expressions of the parties to the end that there be a 'realization of [their] reasonable expectations.'"). New York courts consistently look to dictionary definitions to determine the plain meaning of policy language. *See, e.g.*, *CT Inv. Mgmt. Co., LLC v. Chartis Specialty Ins. Co.*, 9 N.Y.S.3d 220, 224 (1st Dep't 2015).

Like any contract, an insurance policy "should not be interpreted to produce an absurd result, one that is commercially unreasonable, or one that is contrary to the intent of the parties."

10

*Cole v. Macklowe*, 953 N.Y.S.2d 21, 23 (1st Dep't 2012).  Courts must construe the policy in a way that "affords a fair meaning to all of the language employed by the parties in the contract and leaves no provision without force and effect."  *In re Viking Pump, Inc.*, 27 N.Y.3d 244, 257 (2016).  If there is any ambiguity in the policy language, it must be resolved against the insurer and in favor of coverage.  *See AGCS Marine Ins. Co. v. World Fuel Servs., Inc.*, 220 F. Supp. 3d 431, 436 (S.D.N.Y. 2016) ("[I]f policy language is ambiguous, New York law provides that such ambiguities must be construed in favor of the insured and against the insurer.").  Any arguably reasonable reading of the policy in favor of the policyholder controls as a matter of law.  *See Nat'l Football League v. Vigilant Ins. Co.*, 824 N.Y.S.2d 72, 76 (1st Dep't 2006) (insured's "plausible interpretation" supporting coverage "must be sustained").

The rules safeguarding the reasonable expectations of the insured are especially rigorous in the context of exceptions or exclusions.  Under well-established New York law, the insurer bears the "heavy burden" of proving that claims fall entirely and unambiguously within any exclusion, which must be interpreted strictly and narrowly in favor of coverage.  *Belt Painting*, 100 N.Y.2d at 384.  Policy exclusions "are not to be extended by interpretation or implication, but are to be accorded a strict and narrow construction" and will not be interpreted to make the coverage provided by the policy illusory.  *Seaboard Sur. Co. v. Gillette Co.*, 64 N.Y.2d 304, 311 (1984); *see also Thomas J. Lipton, Inc. v. Liberty Mut. Ins. Co.*, 34 N.Y.2d 356, 361 (1974) (rejecting an insurer's interpretation of an exclusion because the interpretation would render the coverage nearly illusory).  Indeed, an insurer must establish that the exclusion is clear and unmistakably is subject to no other reasonable interpretation, and applies in the particular case.  *See Cont'l Cas. Co. v. Rapid-Am. Corp.*, 80 N.Y.2d 640, 652 (1993).

11

## ARGUMENT

I. **NORTHWELL HAS SUFFICIENTLY PLED ITS BREACH OF CONTRACT CLAIM AND DECLARATORY JUDGMENT CLAIM**

Defendant argues that Northwell has not adequately stated a claim for coverage under the Policy, and therefore has failed to state a claim for breach of contract and declaratory judgment, for the following reasons: (1) Northwell has not alleged a "facility-borne illness event;" (2) Northwell has not alleged a "pollution condition;" (3) the Complaint does not allege Northwell's "costs" or "losses;" and (4) Northwell has not alleged conditions precedent to coverage, such as its compliance with the self-insured retention or relevant reporting conditions.  MTD at 10.  For the reasons discussed below, each of Defendant's arguments fails.

### A.   Northwell Has Alleged a "Facility Borne Illness Event"

Defendant contends that there is no coverage for "contamination via a pandemic, where the general population in the surrounding environment is infected at high levels and is thus carrying the virus into the facility."  MTD at 13.  According to Defendant, "[c]overage only applies when the facility is the source of the outbreak."  *Id.*  Instead of basing its argument on the plain text of the Policy, Defendant instead claims that its interpretation is supported by (1) the parties' intentions when they agreed to the Policy's undefined term "facility-borne"; and (2) an incomplete recital of the Policy's one exception for otherwise covered facility-borne illnesses that retracts Defendant's initial concession that the exception cannot apply.  MTD at 13-15.  Northwell addresses each argument in turn.

#### i.   *SARS-CoV-2, the Virus that Causes COVID-19, is "Facility-Borne"*

Notably absent from Defendant's motion to dismiss is any discussion of the common usage of the term "facility-borne" or its plain and ordinary meaning.  While the Policy does not

define the term "facility-borne," the dictionary definition is clear.[3]   In this case, the dictionary defines "facility" as "something (such as a hospital) that is built, installed, or established to serve a particular purpose."   *Facility*, Merriam Webster Dictionary.   "Borne" is defined as "transported or transmitted by."   *Borne*, Merriam Webster Dictionary.   Taken together, the term "facility-borne" means that there is coverage when the facility itself, not just people, can bear and transmit the virus.   Tellingly, in its July 9, 2020 coverage letter, Defendant agreed with Northwell that, based on the dictionary definitions, "the term 'facility-borne' is commonly understood as having been transported or transmitted by the facility."   Dkt. 19-5 (July 9, 2020 letter).   Given the unambiguous policy provisions, Northwell's Complaint adequately states that the coronavirus is "facility-borne," as it is capable of transmission through surfaces and objects, *i.e.*, Northwell's facilities, and is not solely or exclusively communicable through human-to-human contact. Compl. ¶¶ 24-28, 64.

Instead of relying on the plain meaning of the Policy provision, Defendant instead appeals to "what the parties intended."   MTD at 14.   Here, the Policy is unambiguous as the parties have agreed on the common usage of the term "facility-borne," and the parties' intent should be "derived from the plain meaning of the language employed in the agreement[]." *Oppenheimer & Co., Inc. v. Trans Energy, Inc.*, 946 F. Supp. 2d 343, 348 (S.D.N.Y. 2013). Even if the Policy were ambiguous (it is not), Defendant does not offer any evidence of the parties' intentions and resolution of the ambiguity would not be appropriate at the pleading stage. *See id.* at 349 ("[W]hen the language of a contract is ambiguous, its construction presents a question of fact, which of course precludes summary dismissal on a Rule 12(b)(6) motion.").

---

[3] New York courts regularly "refer to the dictionary to determine the plain and ordinary meaning of words" in these circumstances.  *Fed. Ins. Co. v. Am. Home Assur. Co.*, 639 F.3d 557, 567 (2d Cir. 2011).

13

Furthermore, in support of what Defendant believes the parties intended the term "facility-borne" to mean, Defendant cites to language in the exception.  MTD at 14.  However, the exception narrows coverage for otherwise covered "facility-borne" viruses, necessarily indicating that the term "facility-borne" in the first instance is broader than the exception that Defendant cites, otherwise the exception would be redundant.

Finally, Defendant claims it is unreasonable for Northwell to expect coverage for the coronavirus outbreak because it would lead to coverage "on an everyday basis, each and every time a patient walks through the door with any sort of viral or bacterial condition."  MTD at 14.[4] Defendant's concerns about unreasonably broad coverage are unavailing, given that Defendant knew how to limit coverage, and it did so through the Policy's exception and other coverage conditions, which are discussed in detail below.  Furthermore, Defendant's hypothetical about coverage for other types of unspecified viral and bacterial conditions is irrelevant.  Here, Northwell alleges that because the coronavirus can be carried and spread by Northwell's facilities, and not just by people, it is "facility-borne."  Defendant offers no reason for this Court to ignore the plain and ordinary meaning of the term "facility-borne."  The Policy should be interpreted as written, not in the way Defendant wishes it was written to narrow coverage now that the worst has struck.

---

[4] Defendant's argument that Northwell's costs due to the coronavirus pandemic should be assumed by Northwell as everyday "operating costs" because the coronavirus is not "fortuitous" does not pass muster.  MTD at 15.  As the two cases cited by Defendant recognize, "the fortuity doctrine holds that insurance is not available for losses that the policyholder knows of, planned, intended, or is aware are substantially certain to occur."  *40 Gardenville, LLC v. Travelers Prop. Cas. of Am.*, 387 F. Supp. 2d 205, 211 (W.D.N.Y. 2005); *see also Consol. Edison Co. of N.Y. v. Allstate Ins. Co.*, 98 N.Y.2d 208, 219 (2002) (losses are fortuitous where they are "unintended or unexpected" by the policyholder).  Here, there is nothing about the coronavirus crisis that Northwell intended or expected, especially where government mandates concerning how Northwell should maintain its facilities continue to change.

14

ii.     *The Exception to Otherwise Covered "Facility-Borne Illness Events" Does Not Apply*

Defendant invokes the Policy's one exception to otherwise covered facility-borne illness events, claiming that there is no coverage because COVID-19 is an epidemic that is "naturally occurring in the environment in amounts and concentrations discovered at the 'covered location.'" MTD at 14.[5] Defendant misstates the exception. The exception only applies when the otherwise covered facility-borne illness is *both*:

> **1.** Naturally occurring in the environment in amounts and concentrations discovered at the "covered location"; **and**
>
> **2.** Solely or exclusively the result of communicability through human-to-human contact.

Compl. ¶ 45 (emphasis added).

In its motion to dismiss, Defendant does not even attempt to show that COVID-19 is "*solely* or *exclusively* the result of communicability through human-to-human contact," as required for the exception to apply. Compl. ¶ 45 (emphasis added). Nor could it. Defendant has previously admitted that "Chubb does not currently contend that human-to-human contact is the sole or exclusive method of transmission." Dkt. 19-5. Thus, the exception to the facility-borne illness event definition plainly does not apply to Northwell's claim. This Court should deny Defendant's motion to the extent it seeks to bar coverage based on the one exception to "facility-borne illness" coverage.

---

[5] Defendant makes this argument for the first time, having omitted it from the two coverage letters it sent to Northwell. COVID-19 and the virus that causes it are not naturally occurring in the environment in amounts and concentrations discovered at the "covered locations." Northwell is a network of medical facilities. It has been at the center of treating the coronavirus outbreak in the New York metro area during a time when New York bore the brunt of country-wide infections. As alleged in the Complaint, the coronavirus will be in "amounts and concentrations" significantly higher than the surrounding environment given that the "coronavirus comes walking in the door [at Northwell's facilities] every single day and it must be assumed is present in the air and on surfaces at all times." Compl. ¶ 6.

15

### B.      Northwell Adequately Alleges a "Pollution Condition"

Northwell has sufficiently stated the presence of a "pollution condition" sufficient to trigger coverage.   Defendant claims that a "pollution condition" refers "only to traditional environmental pollution."   MTD at 11.   However, the Policy broadly defines a "pollution condition" to mean "hazardous substances, hazardous materials, or waste materials."   Compl. ¶ 46.   The Policy expressly includes in its definition "'mixed waste' and medical, red bag, infectious or pathological wastes."   *Id.*   The Complaint adequately alleges that "hazardous substances or materials and waste materials including infectious wastes . . . are present in Northwell's facilities."   *Id.* ¶ 15.

Northwell also alleges a "covered pollution condition" sufficient to trigger the Policy's business interruption coverage.   The Policy defines "covered pollution condition" as a "'pollution condition' . . . for which coverage is otherwise afforded pursuant to this Policy pursuant to Coverages A. or B., only, for 'remediation costs' resulting from the first-party discovery of such 'pollution condition.'"   Policy at 11 of 62.   "Remediation costs" are "reasonable expenses incurred to investigate, quantify, monitor, mitigate, abate, remove, dispose, treat, neutralize, or immobilize 'pollution conditions' to the extent required by 'environmental law'" within the definition of the Policy.   Compl ¶ 48.   The Policy defines "environmental law" as "any federal, state, commonwealth, municipal or other local law, statute, directive, ordinance, rule, guidance document, regulation, and all amendments thereto, including voluntary cleanup or risk-based corrective action guidance."   *Id.* ¶ 51.   Here, Northwell alleges that it has been subject to a number of "environmental laws" in its provision of care to patients during the coronavirus

pandemic, including laws governing the management and remediation of medical and infectious wastes. *Id.* ¶ 8.[6]

Dismissal of Northwell's claim based on the existence of a "pollution condition" at the pleading stage is particularly inappropriate given the rapidly evolving science on the existence of aerosols and other waste that can be released through some medical procedures on patients infected with COVID-19 as well as the evolving government mandates in this regard.  Dkt. 16 at 16.  The full extent of Northwell's losses in response to these evolving governmental directives should not be decided before discovery.

To deny coverage, Defendant cites cases interpreting pollution *exclusions*, in cases where the insurer attempted to argue that contaminants such as asbestos *were* pollutants and therefore excluded from coverage.  *See Rapid-Am. Corp.*, 80 N.Y.2d at 640 (interpreting a pollution exclusion); *Belt Painting Corp.*, 100 N.Y.2d at 377 (same).  This case involves a coverage grant, not a pollution exclusion.  Compl. ¶ 42.  Defendant's reliance on *Rapid-American* and *Belt Painting* here turns the interpretive rules governing insurance policies on their head, where coverage grants are to be interpreted broadly and exclusions are to be interpreted narrowly.  *See, e.g.*, *Belt Painting Corp.*, 100 N.Y.2d at 383 ("[P]olicy exclusions are given a strict and narrow construction, with any ambiguity resolved against the insurer.").[7]

---

[6] As just one example, New York State's Department of Environmental Conservation has issued infection control precautions and guidance for health care facilities to follow when managing COVID-19 waste.  *See* "Guidance for Healthcare Facilities on Managing COVID-19 Waste," *available at* https://www.dec.ny.gov/chemical/120019.html.

[7] The *Colonial Oil Industries Inc. v. Indian Harbor Insurance Co.*, 528 F. App'x 71 (2d Cir. 2013), case cited by Defendant did not deal with a policy, like the one here, that expressly defined "pollution condition" as including medical and infectious waste.

**C.      The Complaint Sufficiently Pleads Northwell's "Costs" and "Losses"**

Defendant argues that Northwell does not allege covered costs or losses.  Defendant is wrong.  MTD at 16-17.  The Policy provides coverage for "decontamination costs," which are defined as "reasonable and necessary expenses incurred within thirty (30) calendar days of the discovery of a 'facility-borne illness event' to *clean and disinfect* a 'covered location' due to a 'facility-borne illness event' to the extent required by 'environmental laws.'"  Compl. ¶ 50 (emphasis added).  The Policy also covers "remediation costs," or the "[r]easonable expenses incurred to investigate, quantify, monitor, mitigate, abate, remove, dispose, treat, neutralize, or immobilize 'pollution conditions' to the extent required by 'environmental law' in the jurisdiction of such 'pollution conditions.'"  *Id.* ¶ 48.  "Remediation costs" also include Northwell's "[r]easonable legal cost" and "[r]easonable expenses required to restore, repair or replace real or personal property, to substantially the same condition it was in prior to being damaged during the course of responding to a 'pollution condition.'"  *Id.*  The Policy's coverage for "emergency response costs" covers "'remediation costs' or 'decontamination costs', as applicable, incurred within seventy-two (72) hours following the discovery of a 'pollution condition' or 'facility-borne illness event' by an 'insured' in order to abate or respond to an imminent and substantial threat to human health or the environment."  *Id.* ¶ 49.

Northwell sufficiently alleges costs and losses that fall squarely within the above coverages.  For example, as a direct result of a "facility-borne illness event" or a "pollution condition," Northwell alleges costs and losses that include:

- Costs resulting from "numerous, and evolving, mandates from local, state, and federal health authorities as to how to clean or otherwise remediate its facilities and equipment to prevent the spread of the coronavirus and avoid infection among other patients at the facilities or among its employees."  Compl. ¶ 8.

- Costs incurred by Northwell to maintain a clean and safe premises for the influx of COVID-19 patients by "creating more than 1,600 additional beds, secur[ing] personal protective equipment, and ensur[ing] it had necessary staff ready around the clock." *Id.* ¶ 35.

- Costs due to the Northwell health system "using approximately 50 times more oxygen than ever before in treating the respiratory effects of COVID-19." *Id.* ¶ 38.

- Losses that have taken "many forms," with "the most significant drivers of the losses [being] the forced cessation of elective surgeries, the closing of physician's practices, and fewer hospital admissions and visits to or uses of Northwell's other medical facilities due to the pandemic." *Id.* ¶ 39.

All of Northwell's alleged costs are tied to either the cleaning or disinfecting of Northwell's facilities and/or Northwell's response to health care authorities as to how to decontaminate, remediate, or maintain the safety and cleanliness of its facilities. These are covered costs under the Policy, which expressly covers the costs to, among other things, "clean and disinfect" a covered location. Compl. ¶ 50.

Defendant further argues that Northwell has not alleged business interruption loss that is attributable to a "covered pollution condition." MTD at 18. This too is wrong. For the reasons discussed above, given the Policy's broad definitions of both "covered pollution condition" and "environmental laws," Northwell has sufficiently alleged a "covered pollution condition" arising from the coronavirus pandemic. *Supra* at 16-17. As alleged in Northwell's Complaint, Northwell's business interruption losses are due, in part, to the complete transformation of its facilities in light of the numerous and evolving "environmental laws," *i.e.*, mandates from local, state, and federal health authorities, including the increase and diversion of resources, additional precautions required to operate its facilities and manage COVID-19 waste, as well as the forced closure of practices deemed elective. Compl. ¶¶ 8, 11, 33-39; *supra at* 16-17. These allegations are sufficient to allege business interruption losses that are directly attributable to a "covered

19

pollution condition," and the full extent of Northwell's losses can be determined during discovery.

Finally, the cases cited by Defendant in support of its position that Northwell's costs and losses are not covered are inapposite. MTD at 1. In both *Turek Enterprises, Inc. v. State Farm Mutual Auto Insurance Co.*, No. 20-11655, 2020 WL 5258484 (E.D. Mich. Sept. 3, 2020), and *Mauricio Martinez, DMD, P.A. v. Allied Insurance Co.*, No. 20 Civ. 00401, 2020 WL 5240218 (M.D. Fla. Sept. 2, 2020), the courts ruled that there was no coverage for the plaintiffs' claims resulting from COVID-19 because the plaintiffs did not allege "physical loss or damage" as required by their policies or because the claim was precluded by a virus exclusion. In this case, *there is no requirement* in the Policy that Northwell suffer "physical loss or damage" to obtain coverage, and the Policy expressly affords coverage for facility-borne viruses. Thus, the cases cited by Defendant are irrelevant to the issues presented here.

### D. The Complaint Sufficiently Pleads Northwell's Compliance with Conditions Precedent to Coverage

Defendant incorrectly states that Northwell has not pled compliance with all conditions precedent because (1) Northwell has not alleged that it exhausted the applicable self-insured retention; and (2) Northwell has not alleged compliance with the reporting requirements set forth for coverage for decontamination costs.

First, Northwell has alleged satisfaction of the Policy's self-insured retention. The Policy's $20 million in coverage is subject to a $500,000 per-occurrence retention for the first occurrence and a $50,000 maintenance retention for each occurrence thereafter, not to exceed $2 million. Compl. ¶ 43. Defendant wrongly claims that Northwell is subject to a $50,000 maintenance retention even after the $2 million aggregate retention is exhausted. MTD at 5. The $2 million serves as a cap on Northwell's retention, as it is described as an "[a]ggregate

retention for *all* Pollution Conditions and Facility-Borne Illness Events." Policy at 25 of 62 (emphasis added). Here, Northwell alleges damages for its losses and costs in an amount no less than $500,000, exceeding the per-occurrence self-insured retention. Compl. Prayer for Relief (a). Northwell further alleges that it "has sustained, *and is continuing to sustain*, losses covered under the Policy and during the Policy Period." *Id.* ¶ 70 (emphasis added).

Second, Northwell has alleged compliance with all conditions precedent for coverage under the Policy, including all notice and reporting requirements. The Complaint specifically alleges that "Northwell provided prompt notice of its losses, performed all obligations required of it under the Policy, or was ready, willing and able to perform its obligations under the Policy at the time Chubb stated that coverage is not available for the Claim in the May 20 Letter and reaffirmed its disclaimer of coverage in the July 9 Letter." Compl. ¶ 71. This is more than sufficient to satisfy Northwell's burden at the pleading stage. *See, e.g.*, *Evergreen Line A Joint Serv. Agmt. FMC No. 011982 v. US Dynamics Recycling LLC*, No. 18 Civ. 313 (AKH), 2018 WL 6313607, at *3 n.5 (S.D.N.Y. June 12, 2018) ("In pleading conditions precedent, it suffices to allege generally that all conditions precedent have occurred or been performed.").[8]

## II.   NORTHWELL HAS STATED A CLAIM FOR BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING

Defendant's efforts to dismiss Count III of Northwell's Complaint are equally unavailing. Defendant argues (1) that the parties' dispute boils down to a "good faith disagreement" because Defendant's position is "at the very least arguable;" and (2) Northwell has not alleged consequential damages. MTD at 23.

---

[8] Defendant's reliance on *Raymond v. Marks*, 116 F.3d 466 (2d Cir. 1997), is misplaced. There, the Second Circuit affirmed a district court's dismissal of a contract claim for a plaintiff's failure to satisfy conditions precedent only after the district court had heard all the evidence following a bench trial. Defendant's cited case demonstrates that dismissal at the pleading stage, before discovery and the presentation of evidence, is inappropriate.

i.       *Northwell Alleges Defendant's Bad Faith*

This is no "good faith disagreement" between an insurer and an insured that stems from a mere good faith denial of coverage.  MTD at 23.  Nor is this a lawsuit where Northwell would be made whole if it receives the relief it seeks on Counts I and II.  New York courts routinely uphold insurance bad faith claims, despite the assertion of a breach of contract claim, where the "causes of action are predicated on different wrongful conduct and seek different relief."  *Utica Mut. Ins. Co. v. Fireman's Fund Ins. Co.*, 238 F. Supp. 3d 314, 325 (N.D.N.Y. 2017) (bad faith claim against reinsurer was not duplicative of the contract claim as the alleged facts supporting each claim were not identical); *see also D.K. Prop., Inc. v. Nat'l Union Fire Ins. Co. of Pittsburgh, Pa.*, 92 N.Y.S.3d 231, 234 (1st Dep't 2019) ("[A] claim for breach of contract and one for bad faith handling of an insurance claim are not necessarily duplicative" because the "first and second causes of action plead different conduct by defendant").

While there is no precise formula for determining what constitutes bad faith, bad faith conduct "may be overt or may consist of inaction."  *Random Ventures, Inc. v. Advanced Armament Corp., LLC*, No. 12 Civ. 6792 (KBF), 2014 WL 113745, at *48 (S.D.N.Y. Jan. 13, 2014).  Bad faith has been found via inaction, specifically in delayed payments and failures to investigate.  *Bi-Economy Mkt., Inc. v. Harleysville Ins. Co. of N.Y.*, 10 N.Y.3d 187, 195 (2008); *Panasia Estates, Inc. v. Hudson Ins. Co.*, 10 N.Y.3d 200, 203 (2008).  Courts have also found that an insurer's "allegedly pretextual reading of the Policy to deny coverage may qualify as an act of bad faith," as could a tactical shift in an insurer's coverage position to deny coverage.  *SS&C Tech. Holdings, Inc. v. AIG Specialty Ins. Co.*, No. 19 Civ. 7859 (JSR), 2019 WL 7816253, at *5 (S.D.N.Y. Nov. 6, 2019) ("This alleged change in [insurer's] position adequately pleads that [the insurer] has been acting in bad faith.").

In this case, Northwell alleges Defendant's bad faith through allegations that Defendant unnecessarily delayed processing Northwell's claim and put forth baseless and pretextual reasons for denying coverage, even after Northwell demonstrated why Defendant's reasons were incorrect.   Compl. ¶¶ 59-67, 84.   Defendant's shifting reasons for denying coverage have changed in its coverage letters and in the instant motion to dismiss, in which Defendant claims for the first time that the coronavirus is "naturally occurring in the environment in amounts and concentrations discovered" at Northwell's facilities, despite having quoted that Policy language but never having made that argument in prior coverage letters.  *See supra* at 6-9.  Defendant is also now relying upon a Policy exception that it previously admitted could not apply.  *See supra* at 15.

Every time Northwell has rebutted Defendant's coverage position with scientific evidence and confronted Defendant with the Policy terms, instead of reconsidering its position in good faith, Defendant has instead tactically found new reasons to deny coverage, each one untethered to the Policy language and inconsistent with Defendant's earlier statements.  These allegations are sufficient to state a claim for bad faith, and Northwell should be permitted discovery into this claim.

ii.      *Northwell Has Stated a Claim for Consequential Damages*

Northwell sufficiently alleges that "[c]onsequential damages were reasonably contemplated by Northwell and Chubb at the time they entered into the Policy."  Compl. ¶ 89.  Under New York law "consequential damages resulting from a breach of the covenant of good faith and fair dealing may be asserted in an insurance contract context, so long as the damages were 'within the contemplation of the parties as the probable result of a breach at the time of or prior to contracting.'"  *Panasia*, 10 N.Y.3d at 203; *see also Niesenbaum v. AXA Equitable Life*

*Ins. Co.*, No. 600412/2013, 2015 WL 10478082, at *1-2 (N.Y. Sup. Ct. Mar. 12, 2015) (same); *Nat'l R.R. Passenger Corp. v. Arch Specialty Ins. Co.*, 124 F. Supp. 3d 264 (S.D.N.Y. 2015) (allowing policyholder's claim for attorneys' fees and costs as consequential damages for breach of the implied covenant of good faith and fair dealing). At the pleading stage, Northwell need not "explain or describe how and why the 'specific' categories of consequential damages alleged were reasonable and foreseeable at the time of contract." *D.K. Prop., Inc.*, 92 N.Y.S.3d at 233. Accordingly, Northwell has adequately stated its claim for consequential damages, which is recognized under New York law.

## III.   NORTHWELL SUFFICIENTLY PLEADS ITS GENERAL BUSINESS LAW § 349 CLAIM

Section 349 of the General Business Law ("GBL") prohibits "[d]eceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service in this state." N.Y. Gen. Bus. Law § 349(a) (2020). To state a claim under GBL § 349, "a plaintiff must allege that a defendant has engaged in (1) consumer-oriented conduct that is (2) materially misleading and that (3) plaintiff suffered injury as a result of the allegedly deceptive act or practice." *Kronenberg v. Allstate Ins. Co.*, No. 18 Civ.6899(NGG)(JO), 2020 WL 1234603, at *2 (E.D.N.Y. Mar. 13, 2020) (quoting *Orlander v. Staples, Inc.*, 802 F.3d 289, 300 (2d Cir. 2015)). "[A]n action under § 349 is not subject to the pleading-with-particularity requirements of Rule 9(b), Fed. R. Civ. P., but need only meet the bare-bones notice-pleading requirements of Rule 8(a)." *Pelman ex rel. Pelman v. McDonald's Corp.*, 396 F.3d 508, 511 (2d Cir. 2005). Defendant claims that Northwell has not alleged any of the requisite elements. MTD at 24. Northwell will address each element of its GBL § 349 claim in turn.

First, Northwell adequately states that Defendant's conduct was consumer-oriented. Northwell alleges that the Policy Defendant sold Northwell is made up of standard-form terms

and provisions drafted by Defendant and sold to policyholders in New York and elsewhere. Compl. ¶¶ 41, 94.  It is well settled that such allegations are sufficient to demonstrate that an insurer's conduct is consumer-oriented within the meaning of GBL § 349.  *See, e.g.*, *Kurschner v. Mass. Cas. Ins. Co.*, No. 08 Civ. 0011 (JFB)(AKT), 2009 WL 537504, at *5 (E.D.N.Y. Mar. 3, 2009) ("Where, as here, a defendant allegedly enters into 'contractual relationship[s] with customers nationwide' via a standard form contract and has allegedly committed the challenged actions in its dealings with multiple insureds, such behavior plausibly affects the public generally."); *Endemann v. Liberty Ins. Corp.*, 390 F. Supp. 3d 362, 380 (N.D.N.Y. 2019) (plaintiff's allegations that insurer used a standard-form product offered to policyholders at large "nudge Plaintiff's GBL § 349 claim 'across the line from conceivable to plausible'"); *Joannou v. Blue Ridge Ins. Co.*, 289 A.D.2d 531, 531 (2d Dep't 2001) ("An insurance carrier's failure to pay benefits allegedly due [to] its insured under the terms of a standard insurance policy can constitute a violation of General Business Law § 349").[9]

Second, Northwell has sufficiently alleged a deceptive or misleading practice.  Defendant claims that deceptive practices must be limited to "the advertising, sale or pricing of the relevant policies."  MTD at 26.  None of the cases cited by Defendant demonstrate that a deceptive practices violation must be limited to these circumstances.  On the contrary, the Second Circuit

---

[9] The cases cited by Defendant where the courts found an insurer's conduct was not consumer-oriented are readily distinguishable.  In *New York University v. Continental Insurance Co.*, 87 N.Y.2d 308 (1995), the court declined to find a GBL § 349 violation where an insurance policy "was not a standard policy," but was instead "tailored to meet the purchaser's wishes and requirements."  *Id.* at 321.  Likewise, in *Whiteface Real Estate Development & Construction, LLC v. Selective Insurance Co. of America*, No. 08 Civ. 24 (GLS)(DRH), 2009 WL 1373735 (N.D.N.Y. May 13, 2009), there was no allegation that the dispute arose from a standard form policy that the insurer used for multiple policyholders.  In *O.K. Petroleum v. Travelers Indemnity Co.*, No. 09 Civ. 10273 (LMM), 2010 WL 2813804 (S.D.N.Y. July 15, 2020), the court acknowledged that issuance of a standard-form policy could be consumer-oriented, but noted that the plaintiff there, unlike Northwell, failed to allege facts supporting its claim that there was a deceptive practice.

has recognized that GBL § 349 is "applicable to the conduct of insurers," including "in the insurance claims context." *Riordan v. Nationwide Mut Fire. Ins. Co.*, 977 F.2d 47, 52 (2d Cir. 1992). Indeed, "inappropriate delays in processing claims, denials of valid claims, and unfair settlement practices regarding pending claims have all been found under New York law to run afoul of § 349's prohibition on deceptive practices." *Kurschner*, 2009 WL 537504, at *7. Furthermore, a "[p]laintiff['s] allegations that [its] injury resulted from [defendant's] claim settlement practice and policy violative of [New York Insurance Law § 2601] easily satisfies the elements of a claim under Section 349." *Id.* at *6.

Here, Northwell alleges that Defendant, as part of a pattern of deceptive conduct geared toward its policyholders: (1) improperly delayed the processing of Northwell's valid claim; (2) relied on false pretenses to justify its refusal to pay Northwell's claim; (3) persisted in its refusal to pay Northwell's claim and changed tack in its reasons for denying coverage after Northwell rebutted Defendant's reasons for denying Northwell's claim; and (4) violated New York Insurance Law § 2601 through its unfair claim settlement practices. Compl. ¶¶ 59-67, 91-98. These allegations sufficiently allege a deceptive or misleading practice under GBL § 349.

Finally, Northwell has sufficiently alleged injuries flowing from Defendant's deceptive practices. Defendant's argument that inadequate insurance coverage cannot constitute a GBL § 349 injury has been repudiated by the Second Circuit in *Nick's Garage, Inc. v. Progressive Casualty Insurance Co.*, 875 F.3d 107 (2d Cir. 2017). The Second Circuit considered and rejected the insurer's similar argument, stating:

> Insurer argues that § 349 claims of First-Party Assignors fail because they do not allege an injury independent of their contract damages. The cases on which Insurer relies, however, do not establish such a requirement. Rather, those cases found no GBL injury "where the plaintiffs allege damages in the amount of the purchase price of their contracts, but failed to allege that defendants had denied them the services for which they contracted."

26

*Id.* at 125.  The Second Circuit went on to state that under GBL § 349, an "[i]nsurer's alleged failure to pay sufficient sums, if proved, constitutes a sufficient injury."  *Id.*  Here, Northwell has sufficiently alleged its injuries based on Defendant's failure to pay sufficient sums and provide adequate insurance coverage to Northwell and other policyholders under Defendant's standard form policies, along with the consequential damages flowing from Defendant's deceptive practices.  Compl. ¶¶ 94-98.

Accordingly, the Court should deny Defendant's motion to dismiss Northwell's GBL § 349 claim.

## IV.    IF NECESSARY, NORTHWELL SHOULD BE GRANTED THE OPPORTUNITY TO AMEND

"Federal Rule of Civil Procedure 15(a)(2) provides that leave to amend a complaint should be freely granted when justice so requires," and leave to amend is "liberally granted." *Chenensky v. N.Y. Life Ins. Co.*, No 07 Civ. 11504 (WHP), 2012 WL 234374, at *1 (S.D.N.Y. Jan. 10, 2012).  Northwell believes its Complaint is sufficient and the factual challenges lodged by Defendant can and should be vetted during discovery.  However, if necessary, Northwell should be granted leave to amend to cure any deficiencies identified in its Complaint.  For example, Northwell is capable of alleging additional facts in support of its claims, including additional facts concerning its costs and losses, additional facts concerning the conditions precedent to coverage, and additional scientific evidence and government guidance for health care facilities like Northwell that are coming to light on an almost daily basis.  Finally, there is no prejudice to Defendant by an amendment in this early stage of litigation, and Northwell has not yet amended its Complaint.

## **CONCLUSION**

For the reasons set forth above, Northwell respectfully requests that the Court deny Defendant's motion to dismiss.

Dated: New York, New York
       October 16, 2020

MCKOOL SMITH, P.C.

/s/ Robin L. Cohen
Robin L. Cohen
Alexander M. Sugzda
Cynthia Jordano
One Manhattan West
395 9th Avenue, 50th Floor
New York, New York 10001
Tel: (212) 402-9400
Fax: (212) 402-9444
rcohen@mckoolsmith.com
asugzda@mckoolsmith.com
cjordano@mckoolsmith.com

*Attorneys for Plaintiff Northwell Health, Inc.*

28