```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------x
```

NORTHWELL HEALTH, INC.,

        Plaintiff,

 -v-                                                                                         No.  20-CV-6893-LTS-OTW

ILLINOIS UNION INSURANCE COMPANY,

        Defendant.

```
--------------------------------------------------------x
```

## MEMORANDUM OPINION AND ORDER

Plaintiff Northwell Health, Inc. ("Northwell") brings this action for breach of insurance contract, declaratory judgment, breach of the implied covenant of good faith and fair dealing, and violation of N.Y. Gen. Bus. L. section 349 ("GBL section 349"), against its insurer, Defendant Illinois Union Insurance Company ("Illinois Union").  Northwell's claims arise out of Illinois Union's denial of coverage under the terms of the parties' Healthcare Premises Pollution Liability Insurance Policy (docket entry no. 19-1, the "Policy"), for costs allegedly incurred by Northwell in connection with its response to the COVID-19 pandemic.  (See docket entry no. 5-1 ("Compl.") ¶¶ 1-67.)

Before the Court are Northwell's motion for partial summary judgment (docket entry no. 15) and Illinois Union's motion to dismiss (docket entry no. 23).  The Court has subject matter jurisdiction of this action pursuant to 28 U.S.C. section 1332.  The Court has reviewed the parties' submissions[1] thoroughly and, for the following reasons, Northwell's motion for partial

---

[1]    The Court has reviewed the parties' requests for oral argument and finds that oral argument is not necessary.

summary judgment is denied, Illinois Union's motion to dismiss is granted in part and denied in part, and Northwell's request for leave to amend is granted in part and denied in part.

BACKGROUND

The following facts are taken as true for purposes of Illinois Union's motion to dismiss.[2] Northwell is New York State's largest health care provider and private employer, with 23 hospitals and nearly 800 outpatient facilities in the State. (Compl. ¶ 3.) In early 2020, the COVID-19 pandemic began to spread throughout the United States, including in Northwell's facilities. (Id. ¶¶ 12, 23-24.)[3] In the "weeks after the pandemic arrived in earnest," Northwell faced "an enormous amount of [COVID-19] cases." (Id. ¶ 34.) In connection with Northwell's response, it incurred "significant costs and losses." (Id. ¶ 37.) For example, Northwell alleges that its system "was using approximately 50 times more oxygen than ever before in treating the respiratory effects of COVID-19" (id. ¶ 38); it had to "clean or otherwise remediate its facilities and equipment to prevent the spread" of the virus, pursuant to various government mandates (id. ¶ 8); and "many of the various aspects of Northwell's business [ ] ground to a halt or slowed considerably." (Id. ¶¶ 8-10.)

---

[2]  To the extent necessary and relevant to resolution of Northwell's motion for partial summary judgment, the Court refers to facts referenced in the parties' statements filed pursuant to S.D.N.Y. Local Civil Rule 56.1. Such facts are undisputed unless otherwise indicated. Facts characterized as undisputed are identified as such in the parties' Local Civil Rule 56.1 statements or drawn from evidence as to which there has been no contrary, non-conclusory factual proffer. Citations to the parties' respective Local Civil Rule 56.1 Statements (see docket entry no. 17 ("Pl. 56.1 St.") and docket entry no. 31 ("Def. 56.1 St.")) incorporate by reference the parties' citations to underlying evidentiary submissions.

[3]  "COVID-19" is the respiratory illness caused by SARS-CoV-2, a novel coronavirus, which led to a pandemic, as declared by the World Health Organization on March 11, 2020. (See docket entry no. 19 ("Cohen Decl.") Ex. 7.) For simplicity, the Court refers to the virus and the illness it causes as "COVID-19."

"Promptly" upon the pandemic's arrival (Compl. ¶ 14), on April 7, 2020 (Pl. 56.1 St. ¶ 10), Northwell notified Illinois Union that it sought coverage for certain of the COVID-19-related costs under the Policy at issue in this case. (Id. ¶¶ 10-11.) That Policy, which was in effect in early 2020 (Compl. ¶ 12), provides $20 million in coverage, per occurrence and in the aggregate, for certain costs in the event of either a "facility-borne illness event" or a "pollution condition." (Id. ¶¶ 14-15, 43.) The Policy defines a "facility-borne illness event" to mean:

> [T]he presence of a facility-borne infectious virus, bacteria or disease at a "covered location"; provided that such facility-borne infectious virus, bacteria or disease is not:
>
> 1. Naturally occurring in the environment in amounts and concentrations discovered at the "covered location"; and
>
> 2. Solely or exclusively the result of communicability through human-to-human contact.

(Policy § V(Y).) The Policy defines a "pollution condition" to mean:

> 1. The presence of "fungi" or *legionella pneumophila*;
>
> 2. "Illicit abandonment"; or
>
> 3. The discharge, dispersal, release, escape, migration, or seepage of any solid, liquid, gaseous or thermal irritant, contaminant, or pollutant, including smoke, soot, vapors, fumes, acids, alkalis, chemicals, hazardous substances, hazardous materials, or waste materials, on, in, into, or upon land and structures thereupon, the atmosphere, surface water, or groundwater.
>
> For the purpose of this definition, waste materials include, but are not limited to, "low-level radioactive waste", "mixed waste" and medical, red bag, infectious or pathological wastes.

(Policy § V(OO).) "Pollution condition[s]" may trigger coverage under the Policy for certain costs incurred in remediation, emergency response, business interruption and delay, and catastrophe management. (Compl. ¶¶ 13, 44; Policy § I(A)-(F).) "Facility-borne illness

event[s]" may trigger coverage under the Policy for certain costs incurred in decontamination, emergency response, and catastrophe management.  (Compl. ¶¶ 13, 44; Policy § I(A)-(F).)

On May 20, 2020, Illinois Union responded to Northwell, writing that coverage was not available under the Policy because Northwell's claim based on COVID-19 "[did] not involve a 'pollution condition' or a 'facility-borne illness event.'"  (Compl. ¶¶ 59-61.)  Illinois Union wrote that "COVID-19 is an infectious communicable disease caused by a virus, not pollution," and that there had not been a "facility-borne illness event" because "that kind of event is 'generated in the facility itself,' and COVID-19 'is communicable through human-to-human contact.'"  (Id. ¶¶ 61-62.)  On May 29, 2020, Northwell replied, restating its position that a "facility-borne illness event" had occurred and referencing scientific evidence that coronaviruses like COIVD-19 "can survive on surfaces."  (Id. ¶¶ 63-64.)  On July 9, 2020, Illinois Union responded through counsel, restating its position that a facility-borne illness event requires "that the facility must be the source of the virus."  (Id. ¶ 66.)  On July 24, 2020, Northwell filed this action.

## Discussion

Northwell's Motion for Partial Summary Judgment

Northwell moves for partial summary judgment, pursuant to Federal Rule of Civil Procedure 56, on its claims for breach of contract and declaratory judgment, to the extent those claims assert that "COVID-19, and the virus that causes it, plainly satisfy the Policy definition of a 'facility-borne illness event,' triggering coverage."  (Docket entry no. 16 at 2.)

Summary judgment is to be granted in favor of a moving party if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  A fact is considered material if it "might

affect the outcome of the suit under the governing law," and an issue of fact is a genuine one where "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Holtz v. Rockefeller & Co. Inc., 258 F.3d 62, 69 (2d Cir. 2001) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)). To defeat summary judgment, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." Caldarola v. Calabrese, 298 F.3d 156, 160 (2d Cir. 2002) (citation omitted). The nonmoving party "may not rely on mere conclusory allegations nor speculation, but instead must offer some hard evidence showing that its version of the events is not wholly fanciful." Golden Pac. Bancorp v. FDIC, 375 F.3d 196, 200 (2d Cir. 2004) (citation omitted).

In an insurance dispute, when insurance contract language is unambiguous, "the district court [may] construe it as a matter of law and grant summary judgment accordingly." Palmieri v. Allstate Ins. Co., 445 F.3d 179, 187 (2d Cir. 2006) (Sotomayor, J.) (quoting Thompson v. Gjivoje, 896 F.2d 716, 721 (2d Cir. 1990)). "Whether the language of an insurance policy is ambiguous is a question of law[.]" Duane Reade, Inc. v. St. Paul Fire & Marine Ins. Co., 600 F.3d 190, 201 (2d Cir. 2010). "An ambiguity exists where the terms of an insurance contract could suggest 'more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages and terminology as generally understood in the particular trade or business.'" Morgan Stanley Grp. Inc. v. New England Ins. Co., 225 F.3d 270, 275 (2d Cir. 2000) (citation omitted); accord Belt Painting Corp. v. TIG Ins. Co., 100 N.Y.2d 377, 383 (2003) ("We read an insurance policy in light of 'common speech' and the reasonable expectations of a businessperson[.]").

"When faced with ambiguity in an insurance policy, a reviewing court should consider extrinsic evidence submitted by the parties to assist in determining their actual intent."

McCostis v. Home Ins. Co. of Indiana, 31 F.3d 110, 113 (2d Cir. 1994).  "If the extrinsic evidence does not yield a conclusive answer as to the parties' intent, it is appropriate for a court to resort to other rules of construction, including the contra-insurer rule, which states that any ambiguity in an insurance policy should be resolved in favor of the insured."  Id. at 113.

    The Court concludes that the term "facility-borne illness event" in the parties' Policy is ambiguous as to whether it includes matters arising from the virus that causes COVID-19.  The Policy does not define the term "facility-borne," and the parties neither submit dictionary or institutional definitions of the conjoined term, nor point to any case law construing it.  While Northwell refers to scientific evidence for the proposition that the virus that causes COVID-19 may be transmitted when an infected person leaves infected droplets on an object or surface and another person touches that object or surface and then touches "their eyes, noses or mouths before cleaning their hand" (Pl. 56.1 St. ¶ 22), the Court cannot conclude on this record that the parties intended mere surface transmissibility to render an illness "facility-borne."  Furthermore, the same guidance provides that the virus spreads "mainly" between "people who are in close contact with each other . . . when infectious particles that pass through the air are inhaled at short range . . . or if infectious particles come into direct contact with the eyes, nose, or mouth."  World Health Organization, Coronavirus disease (COVID-19): How is it transmitted?, https://www.who.int/news-room/q-a-detail/coronavirus-disease-covid-19-how-is-it-transmitted (last visited March 29, 2022).[4]  Whether a reasonable businessperson, cognizant of the practices

---

[4]  Accord Centers of Disease Control and Prevention, Science Brief: SARS-CoV-2 and Surface (Fomite) Transmission for Indoor Community Environments, https://www.cdc.gov/coronavirus/2019-ncov/more/science-and-research/surface-transmission.html (last visited March 29, 2022) ("The principal mode by which people are infected with SARS-CoV-2 (the virus that causes COVID-19) is through exposure to respiratory droplets carrying infectious virus.  It is possible for people to be infected through contact with contaminated surfaces or objects (fomites), but the risk is generally considered to be low.").  As Northwell notes (see docket entry no. 16 at 13), the Court

of medical care facilities (in which all manner of viruses, bacteria, and disease are present on a regular basis) would have understood the presence of any virus which merely can be transmitted on a surface (but which is "mainly" not transmitted by that means) to constitute a "facility-borne" virus cannot be resolved by reference to the plain language of the Policy alone.

      Given the Policy's ambiguity as to what constitutes a "facility-borne" virus, and Illinois Union's request for the opportunity to conduct discovery of extrinsic evidence potentially relevant to the meaning of that term (see docket entry no. 30 at 12-15), the Court denies Northwell's motion for partial summary judgment, without prejudice to renewal once the parties have had the opportunity to conduct such discovery. See Fesco Inc. v. Shone, 205 F.3d 1322, 2000 WL 232272, at *2 (2d Cir. 2000) (unpublished) (remanding insurance dispute involving ambiguous language and directing that the parties "be permitted further discovery"); Am. Com. Lines LLC v. Water Quality Ins. Syndicate, 679 F. App'x 11, 16 (2d Cir. 2017) (same).[5]

Illinois Union's Motion to Dismiss

      Illinois Union moves to dismiss Northwell's Complaint in its entirety, pursuant to Federal Rule of Civil Procedure 12(b)(6), on the grounds that the Complaint fails to plausibly allege (1) the occurrence of either a facility-borne illness event or a pollution condition resulting from the COVID-19 pandemic, (2) that Northwell suffered any costs covered under the Policy, or that it satisfied the Policy's conditions precedent to seeking coverage as to those costs, and (3) a claim for relief as to either of Northwell's extracontractual claims, as a matter of law.

---

may take judicial notice of these materials retrieved from official government websites.

[5]    Given the Court's determination that the term "facility-borne" is ambiguous as applied here, the Court does not reach the parties' arguments concerning the relevance, if any, of the fortuity doctrine, of the parties' pre-suit discussions (see Def. 56.1 St. ¶¶ 29-32), or of the parties' course of performance (id. ¶ 33), at this stage.

To survive a Rule 12(b)(6) motion to dismiss, a complaint must plead "enough facts to state a claim to relief that is plausible on its face." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007). A proper complaint cannot simply recite legal conclusions or bare elements of a cause of action; there must be factual content pleaded that "allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009). The Court accepts as true the nonconclusory factual allegations in the complaint and draws all reasonable inferences in the nonmoving party's favor. Roth v. Jennings, 489 F.3d 499, 501 (2d Cir. 2007).

Pollution Condition

Illinois Union first argues that Northwell's Complaint should be dismissed because Northwell has failed to allege plausibly that the COVID-19 pandemic led to the occurrence of either a facility-borne illness event or a pollution condition.

In light of the Court's determination that the Policy is ambiguous as to whether the COVID-19 pandemic led to the occurrence of facility-borne virus event, the Court denies Illinois Union's motion to dismiss to the extent it seeks dismissal of Illinois Union's claims based on the alleged occurrence of such an event.

As to whether Northwell has adequately alleged the occurrence of a "pollution condition" resulting from COVID-19, however, the Court concludes that Northwell has not and that Illinois Union's motion should be granted as to Northwell's pollution clause-based claims. As Northwell acknowledges, at least in the context of policy exclusions, New York courts generally construe language similar to this Policy's definition of a pollution condition— involving the "discharge, dispersal, release, escape, migration, or seepage" of any pollutant or other enumerated contaminants "on, in, into, or upon land and structures thereupon, the

atmosphere, surface water, or groundwater"—as referring to traditional environmental pollution. Belt Painting, 100 N.Y.2d at 388 (relying on the "environmental implications of the terms 'discharge, dispersal, seepage, migration, release or escape'" to conclude that "ordinary paint or solvent fumes that drifted a short distance from the area of the insured's intended use and allegedly caused inhalation injuries to a bystander" did not unambiguously fall within the scope of the disputed pollution exclusion); Cont'l Cas. Co. v. Rapid-Am. Corp., 80 N.Y.2d 640, 654 (1993) ("The terms used in the exclusion to describe the method of pollution—such as 'discharge' and 'dispersal'—are terms of art in environmental law used with reference to damage or injury caused by disposal or containment of hazardous waste[.]").[6]

In recent years, at least two courts in New York have applied the same interpretative framework to pollution policy coverage provisions. Colonial Oil Indus. Inc. v. Indian Harbor Ins. Co., 528 F. App'x 71, 75 (2d Cir. 2013) ("These cases [including Belt Painting and Cont'l Cas. Co.] make clear that the 'reasonable expectations of a businessperson' viewing the contested Policy language would be that it is intended to provide coverage for

---

[6] In another case Northwell filed in this District arising out of an insurance dispute stemming from the effects of the COVID-19 pandemic, Northwell relied on this case law, explaining that "Belt Painting is binding New York precedent that held that a materially identical exclusion was limited to traditional environmental harms," and that "[a]n example of the type of viruses that could be excluded [by the applicable policy's pollution exclusion provision], given Northwell's business, would be viruses or bacteria found in red bag or biomedical waste, which are safe when handled correctly, but can harm human health or property if released due to incorrect containment or disposal." Northwell Health, Inc. v. Lexington Ins. Co., No. 1:21-CV-1104-JSR (S.D.N.Y.), ECF No. 38 at 2, 4. See also id., ECF No. 28 at 12 ("The modified contamination exclusion's reference to 'release, discharge, escape, or dispersal' of contaminants and pollutants shows that it was intended by Defendants to apply only to contaminants and pollutants used or maintained in the course of an insured's industrial business—such as chemicals used in manufacturing or cleaning processes, or bacteria or virus kept in a lab—that are accidentally released or discharged from their containers. This exclusion does not apply to losses resulting from a pandemic. Rather, it is limited to losses resulting from traditional environmental or industrial harms.").

environmental harm resulting from the disposal or containment of hazardous waste."). Accord URS Corp. v. Zurich Am. Ins. Co., 43 Misc. 3d 391, 396-97 (N.Y. County Sup. Ct. 2014). As explained in URS Corp., "[g]iven the close identity between the traditional pollution exclusion provision and [the relevant] pollution coverage provision, it would be logical to conclude that the two clauses share the same purpose and are complementary, with one meant to fill the gap in coverage created by the other." Id. In both URS Corp. and Colonial Oil, the court dismissed an insured's claim under such a pollution coverage provision on the pleadings, without resort to extrinsic evidence, in light of New York's traditional construction of policy language similar to the language in the Policy at issue here.

Applying the same traditional construction here, the Court concludes that Northwell has not plausibly alleged the occurrence of a "pollution condition," as that term is defined under the Policy, resulting from Northwell's treatment of COVID-19 patients. A sick patient's delivery of COVID-19 into one of Northwell's hospitals or other medical facilities "by merely breathing, speaking, or touching objects and surfaces," as Northwell alleges (Compl. ¶ 26), or "through some medical procedures," as Northwell argues in its briefing (see docket entry no. 29 ("MTD Opp.") at 17), cannot reasonably be characterized as constituting the "discharge, dispersal, release, escape, migration, or seepage" of any "waste materials" "on, in, into, or upon land and structures thereupon, the atmosphere, surface water, or groundwater," lest every person entering one of Northwell's facilities with a communicable disease constitute a "pollution condition" under the Policy. Such an interpretation would also risk rendering superfluous the Policy's separate definition of a "facility-borne illness event," which—under either party's construction—is only triggered by the presence of a certain subset of viruses, bacteria, and diseases in Northwell's facilities. See Fireman's Fund Ins. Co. v. OneBeacon Ins. Co., 495 F. Supp. 3d 293, 300 (S.D.N.Y. 2020) ("Any interpretation of a contract that has the effect of

rendering at least one clause superfluous or meaningless . . . is not preferred and will be avoided if possible.") (internal citations and quotation marks omitted).

Indeed, other federal courts construing materially identical pollution coverage provisions in the COVID-19 context have reached the same result. For example, in London Bridge Resort LLC v. Illinois Union Ins. Co., 505 F. Supp. 3d 956 (D. Ariz. 2020), the court, citing Colonial Oil and URS Corp., construed the applicable policy's pollution coverage provision as relating to "traditional environmental pollution," and had "little trouble concluding that no plausible interpretation of 'traditional environmental pollution' includes a virus outbreak." Id. at 959.[7]  Accord Essentia Health v. ACE Am. Ins. Co., 541 F. Supp. 3d 943, 952 (D. Minn. 2021) ("Essentia provides no persuasive reason why the reasonable-expectations doctrine should require interpreting the term 'pollution condition' to include viruses."); Cent. Laundry, LLC v. Illinois Union Ins. Co., No. 1:20-CV-1273-RDA-TCB, 2022 WL 47616, at *8 (E.D. Va. Jan. 5, 2022) ("Already there have been a number of district courts that have considered whether COVID-19 can be reasonably considered a pollutant for purposes of insurance policy coverage. And each of those courts has decidedly ruled that no reasonable plain reading of 'pollutant' or 'pollution' captures COVID-19 where no explicit language exists to include viruses.").

---

[7] London Bridge was decided under Arizona law, which, consistent with New York law, construed provisions referring to the "discharge," "dispersal," "release," and "escape" of contaminants as referring to "traditional environmental pollution." Id. at 959-60. The Policy in London Bridge defined a pollution condition as: "The discharge, dispersal, release, escape, migration, or seepage of any solid, liquid, gaseous or thermal irritant, contaminant, or pollutant, including soil, silt, sedimentation, smoke, soot, vapors, fumes, acids, alkalis, chemicals, electromagnetic fields (EMFs), hazardous substances, hazardous materials, waste materials, 'low-level radioactive waste,' 'mixed waste' and medical, red bag, infectious or pathological wastes, on, in, into, or upon land and structures thereupon, the atmosphere, surface, water, or groundwater." Id. at 958.

The Court agrees and concludes that Northwell "does not advance an interpretation of the policy language which is sensible in light of common speech and the reasonable expectations of a businessperson," URS Corp., 43 Misc. 3d at 397, and, therefore, that Northwell fails to state a plausible claim that COVID-19 triggered the Policy's coverage by way of the occurrence of a "pollution condition."

Costs and Losses

Illinois Union next argues that Northwell fails to adequately allege its entitlement to reimbursement of costs allegedly incurred under the Policy, asserting that Northwell fails to allege having timely incurred any such costs, and that Northwell fails to allege that it satisfied all conditions precedent to coverage as to those costs.

In connection with its claim that a "facility-borne illness event" occurred under the Policy, Northwell principally seeks recovery of "decontamination costs." (Compl. ¶ 44.)[8] The Policy defines decontamination costs to mean "reasonable and necessary expenses incurred within thirty (30) calendar days of the discovery of a 'facility-borne illness event' to clean and disinfect a 'covered location' due to a 'facility-borne illness event' to the extent required by 'environmental laws,'" as well as certain expenses incurred in relocating occupants in Northwell's care to another facility. (Policy § V(P).) Northwell also seeks recovery of "emergency response costs" (Compl. ¶ 49), which are defined to include decontamination costs "incurred within seventy-two (72) hours following the discovery of a . . . 'facility borne illness

---

[8] In its Complaint, Northwell also seeks recovery of remediation costs and business interruption losses, both of which are recoverable only in the event of a "pollution condition." Having concluded that Northwell does not plausibly allege the occurrence of a pollution condition, the Court concludes that Northwell has not plausibly alleged its entitlement to recovery of such costs or losses in this action.

event' by an 'insured' in order to abate or respond to an imminent and substantial threat to human health or the environment arising out of . . . 3. [a] facility-borne illness event." (Policy § V(S).) Coverage for decontamination costs "only applies to [ ] 'facility-borne illness events'" that "1. Require reporting to any local, state or federal governmental agency or other agency that maintains oversight authority over the 'covered location'; and 2. Are reported to the Insurer, in writing, during the 'policy period', but in no event later than: a. Seventy-two (72) hours following the 'insured's' reporting to any of the entities identified in Item 1., above; or b. The expiration of the 'policy period', whichever occurs first." (Policy § I(D).) Such costs are also only recoverable "in excess of the 'self-insured retention'" (id.); Illinois Union's "obligation to pay" for decontamination costs "shall attach" only after Northwell has paid the "full amount of the self-insured retention" (Policy § II(A)), which is $500,000 "Per . . . Facility-Borne Illness Event." (Policy Endorsement No. 002.)

Illinois Union first argues that Northwell has failed to plausibly allege that it timely incurred any "decontamination costs." (See docket entry no. 24 at 17 ("The Complaint alleges no costs that fit within these definitions. . . . The Complaint also alleges no information concerning the timing of costs incurred relative to discovery of the virus in the facility.").) In its Complaint, however, Northwell alleges that it has been complying with "numerous, and evolving, mandates from local, state, and federal health authorities as to how to clean or otherwise remediate its facilities and equipment" in response to COVID-19 (Compl. ¶ 8), that it "faced an enormous amount of cases in the weeks after the pandemic arrived in earnest" (id. ¶ 34), and that it incurred costs "to decontaminate its facilities" in response to that arrival. (Id. ¶ 42.) The Complaint frames these allegations within the context of Northwell's allegations that it was on "the front lines in the war to contain COVID-19's spread" (id. ¶ 7), with nearly two dozen hospitals in the New York City metro area (id. ¶ 5), at a time (in March 2020) when New

York City was "the hardest hit area in the early stages of the COVID-19 pandemic in the United States" (id. ¶ 2) and patients with the virus were "walking in the door every single day." (Id. ¶ 6.) In this context, and drawing all reasonable inferences in its favor, Northwell has plausibly alleged that it timely incurred "decontamination costs" in response to the arrival of the COVID-19 pandemic to its facilities.

Illinois Union's second argument is that Northwell has failed to plausibly allege that it satisfied the Policy's conditions precedent to coverage as to those costs. "In pleading conditions precedent, it suffices to allege generally that all conditions precedent have occurred or been performed," Fed. R. Civ. P. 9(c), but a party must allege sufficient facts to render those allegations plausible. Dervan v. Gordian Grp. LLC, No. 16-CV-1694-AJN, 2017 WL 819494, at *6 (S.D.N.Y. Feb. 28, 2017) ("the occurrence or performance of a condition precedent—to the extent that it need be pled as a required element of a given claim[9]—must be plausibly alleged in accordance with Rule 8(a)"); O.F.I. Imports Inc. v. Gen. Elec. Cap. Corp., No. 15-CV-7231-VEC, 2017 WL 3084901, at *5 (S.D.N.Y. July 20, 2017) ("[P]ost-Iqbal, Rule 9(c)'s command

---

9   Whether a plaintiff must plausibly allege its satisfaction of a condition precedent in order to state a claim may also hinge on whether that condition precedent is properly considered an affirmative defense or an element of the plaintiff's prima facie claim. Compare H&H Env't Sys., Inc. v. Evanston Ins. Co., No. 6:18-CV-06315-EAW, 2019 WL 1129434, at *4 (W.D.N.Y. Mar. 12, 2019) ("[The plaintiff] is under no obligation to affirmatively plead compliance with conditions precedent." (citation omitted)) with O.F.I. Imports Inc., 2017 WL 3084901, at *4 ("In order to adequately plead breach of contract under New York law a plaintiff must allege . . . adequate performance of the contract by the plaintiff," which includes "satisfaction of conditions precedent to the Defendant's obligations.") and Boustead Sec., LLC v. Leaping Grp. Co., No. 20-CV-3749-VEC, 2021 WL 3774116, at *4 (S.D.N.Y. Aug. 25, 2021) ("'Adequate performance' of a plaintiff's obligations under a contract includes satisfaction of conditions precedent to the defendant's obligations."). Northwell does not argue that the conditions precedent raised by Illinois Union should be considered affirmative defenses, rather than as aspects of its own performance under the Policy, and the Court declines to address this issue sua sponte. See Vasquez v. New York City Dep't of Educ., No. 11-CV-3674-AJN, 2015 WL 3619432, at *14 (S.D.N.Y. June 10, 2015) ("Courts generally deem an argument waived or abandoned if a party fails to make it."), aff'd, 667 F. App'x 326 (2d Cir. 2016).

that conditions precedent be alleged 'generally' requires plaintiffs to allege <u>plausibly</u> that they have satisfied conditions precedent.") (emphasis in original); <u>Comerica Leasing Corp. v. Bombardier Inc.</u>, No. 16-CV-614-PGG, 2019 WL 11027701, at *8 (S.D.N.Y. Sept. 30, 2019) (same).

The Complaint alleges that "Northwell provided prompt notice of its losses, performed all obligations required of it under the Policy, or was ready willing and able to perform its obligations under the Policy[.]" (Compl. ¶ 71.) This conclusory allegation is insufficient to allege plausibly either that Northwell provided the governmental and related notices required by section I(D) of the Policy, or that it fulfilled the Policy's self-insured retention requirement. <u>See</u> <u>Dervan</u>, 2017 WL 819494, at *6 (finding that a "threadbare" allegation that "[a]ll conditions precedent to Defendant's contractual obligation to pay Plaintiff" under the Agreement "have occurred" failed to provide the "sufficient factual matter" required for the Court "to draw the reasonable inference" that the plaintiff had satisfied his conditions precedent, and collecting cases). Northwell's general allegation that it provided "prompt" notice of its claim to Illinois Union (Compl. ¶¶ 14, 59, 71) also fails to plausibly allege that it timely made the notices required by section I(D), or that those notices were either not required or should be excused. Nor does Northwell's allegation that it has sustained damages in excess of $500,000 (<u>see</u> Compl. Prayer for Relief § (a)) suffice to allege plausibly that Northwell paid the full amount of the Policy's $500,000 self-insured retention applicable to decontamination costs, since Northwell's pleading as currently framed seeks costs and losses, including remediation costs and business interruption losses that are only recoverable upon the occurrence of a "pollution condition," which Northwell has not plausibly alleged here.[10]

---

[10]   On reply, Illinois Union also argues that, to the extent Northwell has alleged the occurrence of a "facility-borne illness event," "Northwell has alleged multiple conditions

The Court therefore grants Illinois Union's motion to dismiss to the extent it challenges Northwell's Complaint on the ground that Northwell has failed to plausibly allege its satisfaction of the Policy's conditions precedent to coverage. However, because Northwell claims that it is "capable of alleging additional facts in support of its claims, including additional facts concerning its costs and losses, [and] additional facts concerning the conditions precedent to coverage" (MTD Opp. at 27), the Court grants Northwell's request to file an amended pleading alleging facts demonstrating its satisfaction of those conditions.

Northwell's Extra-Contractual Claims

Illinois Union also moves to dismiss Northwell's two extra-contractual claims—breach of the implied covenant of good faith and fair dealing, and violation of GBL section 349—for failure to state a claim.

"As in all contracts, implicit in contracts of insurance is a covenant of good faith and fair dealing, such that 'a reasonable insured would understand that the insurer promises to investigate in good faith and pay covered claims[.]'" Bi-Econ. Mkt., Inc. v. Harleysville Ins. Co. of New York, 10 N.Y.3d 187, 194 (2008) (quoting New York Univ. v Cont'l Ins. Co., 87 NY2d 308, 318 (1995)). However, "[m]ere difference of opinion between an insurer and an insured

---

or events occurring over time" (docket entry no. 38 at 6-7), and must therefore allege that it has paid the required self-insured retention and/or "maintenance retention" as to each such event. This position may be in tension with the language of Policy Endorsement No. 002, which provides that "[o]ne 'self-insured retention' shall apply to all 'claims', 'remediation costs', 'emergency response costs', 'decontamination costs', 'catastrophe management costs' and associated 'legal defense expense[s]' arising from the same, continuous, repeated, or related 'pollution condition' or 'facility-borne illness event'." (Policy Endorsement No. 002 (emphasis added).) However, the parties have not fully briefed that issue, and the Court declines to reach it at this time. In re Various Grand Jury Subpoenas, 235 F. Supp. 3d 472, 485 (S.D.N.Y. 2017) ("The law in the Second Circuit is clear that arguments or requests for relief raised for the first time in reply briefs need not be considered."), modified, No. 12-MC-381, 2017 WL 564676 (S.D.N.Y. Feb. 13, 2017).

over the availability of coverage does not constitute bad faith; to show bad faith the insured must demonstrate that 'no reasonable carrier would, under the given facts' deny coverage." Jane St. Holding, LLC v. Aspen Am. Ins. Co., No. 13-CV-2291-RWS, 2014 WL 28600, at *10 (S.D.N.Y. Jan. 2, 2014) (citation omitted), aff'd, 581 F. App'x 49 (2d Cir. 2014); accord Liberty Surplus Ins. Corp. v. Segal Co., 420 F.3d 65, 70 (2d Cir. 2005) ("While we have agreed with Segal's position that the ERP is unambiguous and requires Liberty to indemnify Segal subject to exhaustion of the Underlying Policies, the dispute reflects an 'arguable difference of opinion' rather than bad faith by the insurer.").

In support of its claim that Illinois Union denied coverage in bad faith, Northwell alleges that Illinois Union responded to Northwell's claim in a delayed fashion (Compl. ¶¶ 59, 65-66), "put forward baseless and nonsensical reasons" for its denial "even after Northwell ha[d] demonstrated why those reasons [were] meritless" (id. ¶ 84), and provided "shifting reasons" for its denial in its coverage letters and in its papers filed in this case (MTD Opp. at 22-23). These allegations fail to allege plausibly that Illinois Union engaged in bad faith.

First, Illinois Union's alleged delay—which involved replying to each of Northwell's two letters seeking coverage within less than two months—came in the context of a pandemic with "staggering" impacts "on life and property" (Compl. ¶ 23) and, as Northwell argues, at a time when both the scientific understanding of COVID-19 and government mandates related to it were "rapidly evolving." (MTD Opp. at 1, 17.) At least in this context, Defendant's delay is, without more, insufficient to support plausibly an inference that Illinois Union denied Northwell's claim in bad faith, Utica Mut. Ins. Co. v. Fireman's Fund Ins. Co., 238 F. Supp. 3d 314, 331 (N.D.N.Y. 2017) (allegations of "delay tactics" held insufficient to allege bad faith), at least in the absence of allegations that the delay itself caused independent harm to Northwell. Cf. Bi-Econ. Mkt., 10 N.Y.3d at 195 (delay could form the basis of a bad faith claim against an

insurer, where the delay itself led to the "collapse" of the insured's business). Second, Northwell's critique of Illinois Union's bases for denying coverage constitutes only an "arguable difference of opinion," notwithstanding Northwell's provision to Illinois Union of scientific evidence purportedly supporting its position. Dahlinger v. First Am. Specialty Ins. Co., No. 19-CV-0020-LEK-TWD, 2020 WL 1511261, at *4 (N.D.N.Y. Mar. 30, 2020) (dismissing bad faith claim despite the plaintiff's allegations that a defendant "disregarded" plaintiff's "information"). Third, while Illinois Union's legal theories have developed with the onset of litigation, its principal argument—that COVID-19 is not "facility-borne" because a facility is not the source of the virus—has remained consistent. Because Northwell fails to allege plausibly that Illinois Union denied coverage in bad faith, its claim of breach of the implied covenant of good faith and fair dealing must be dismissed.

So too must Northwell's claim alleging a violation of GBL section 349. That is so because a plaintiff asserting a claim under section 349 must allege consumer-oriented conduct, and "[t]ransactions between businesses or sophisticated parties that do not affect average consumers do not constitute consumer-oriented conduct." Axiom Inv. Advisors, LLC by & through Gildor Mgmt., LLC v. Deutsche Bank AG, 234 F. Supp. 3d 526, 537 (S.D.N.Y. 2017). This dispute, between "New York State's largest health care provider and private employer" (Compl. ¶ 3) and one of its insurers, involving a private coverage dispute, does not qualify. See PB Americas Inc. v. Cont'l Cas. Co., 690 F. Supp. 2d 242, 252 (S.D.N.Y. 2010) ("[S]everal courts in this Circuit have considered whether disputes between policy holders and insurance companies concerning the scope of coverage can amount to conduct falling within § 349. Almost uniformly, those courts have held that such disputes are nothing more than private contractual disputes that lack the consumer impact necessary to state a claim pursuant to § 349."). See also New York Univ. v. Cont'l Ins. Co., 87 N.Y.2d 308, 321 (1995) (section 349 did

not apply to what was "essentially a 'private' contract dispute over policy coverage and the processing of a claim" between a "major university acting through its director of insurance, and a large national insurance company").

Northwell's allegation that the Policy contains "standard-form" language that "on information and belief, it uses in insurance policies sold to many other policyholders" (Compl. ¶ 94) does not bring this commercial dispute within the scope of transactions covered by GBL section 349.  Indeed, Northwell does not allege that the parties' standard form policy was inherently deceptive; it alleges instead that Illinois Union "rel[ied] on false pretenses to justify" denial of Northwell's claim, and "persist[ed] in refusing to pay Northwell's claim even after Northwell rebutted the reasons" Illinois Union proffered as a basis for that denial.  (Id. ¶ 93.) These allegations are specific to Northwell, and therefore do not suffice to allege "consumer-oriented" conduct.  See O.K. Petroleum v. Travelers Indem. Co., No. 09-CV-10273-LMM, 2010 WL 2813804, at *5 (S.D.N.Y. July 15, 2010) ("The fact that Plaintiffs possessed form policies does not lead to the conclusion that Defendants employed the alleged deceptive practices of 'inordinate delays, unilateral[ ] changing [of] contract terms, and denial of benefits,' [ ] to other insureds who possessed these form policies."); Kramer v. Lockwood Pension Servs., Inc., 653 F. Supp. 2d 354, 385 (S.D.N.Y. 2009) ("Although it is true that Lincoln has issued a standard form policy and then resisted paying benefits associated with that policy, such behavior is not properly considered 'consumer-oriented' where, as here, the parties include sophisticated insurance brokers and not ordinary consumers to whom the statute is directed.").  Accord Mohawk Gaming Enterprises, LLC v. Affiliated FM Ins. Co., 534 F. Supp. 3d 216, 224 (N.D.N.Y. 2021) (dismissing GBL section 349 claim based on "a private insurance contract between two sophisticated parties" despite the insured's "series of conclusory allegations about [its insurer]'s broader approach to coverage decisions vis-a-vis the COVID-19 pandemic").

CONCLUSION

For the reasons discussed above, Northwell's motion for partial summary judgment is denied, Illinois Union's motion to dismiss the Complaint is granted in part and denied in part as set forth above, and Northwell is granted leave to file an amended complaint alleging additional facts concerning its costs and losses and the conditions precedent to coverage. Northwell must file that amended complaint, together with a blacklined version showing all changes from its current complaint, by **April 26, 2022**.

This case remains referred to Magistrate Judge Wang for general pretrial management.

This Memorandum Opinion and Order resolves docket entry nos. 15 and 23.

SO ORDERED.

Dated: March 29, 2022
      New York, New York

      /s/ Laura Taylor Swain
      LAURA TAYLOR SWAIN
      Chief United States District Judge